Sammie Lee GOODMAN, as Executrix of the Estate of Clinton Goodman, Plaintiff–Appellant,

v.

James PHYTHYON, M.D., Rex Leatherwood, C.R.N.A., and Glenn Wolfson, M.D., Defendants–Appellees.

Court of Appeals of Tennessee, Western Section, at Nashville.

Oct. 19, 1990.

Application for Permission to Appeal Denied by Supreme Court Dec. 31, 1990.

W.A. Moody, and John L. Whitfield, Jr., Nashville, for plaintiff-appellant.

Ward DeWitt, Jr., and Cynthia E. Berry, Nashville, for defendant-appellee, Glenn Wolfson, M.D.

CRAWFORD, Judge.

This is a plaintiff's appeal from the order of the trial court granting summary judgment. Plaintiff, Clinton Goodman[1], filed his complaint against defendants James Phythyon, M.D., Rex Leatherwood, C.R. N.A., and Glenn Wolfson, M.D. on January 11, 1988. The complaint was voluntarily dismissed as to defendants Phythyon and Leatherwood and this appeal involves only the summary judgment granted to defendant Wolfson.

The plaintiff alleges that he was under the care of defendant Wolfson, an ophthalmologist, for cataract surgery, that Wolfson arranged for the anesthesia to be administered by defendant Phythyon and that Phythyon turned the case over to his employee Leatherwood, a nurse anesthetist. The complaint alleges various and sundry acts of negligence against the defendants Phythyon and Leatherwood which we will not set out in detail since they are not involved further in the case. Plaintiff generally alleges that these two defendants were guilty of negligence in their selection of the anesthetic agent, their use of the drug, and their failure to supervise and maintain the plaintiff in a proper manner for the operation. The allegations of negligence against the defendant Wolfson are set out in the complaint as follows:

15. The plaintiff alleges that the operating physician defendant, Wolfson, had control of the entire procedure and that he was negligent in allowing the anesthesia to be administered by a nurse anesthetist. The defendant, Wolfson, was negligent in not being versed in the administration of the anesthesia agent used in this case. The defendant, Wolfson, was further negligent in failing to determine the cause of the uncontrollable activity of the plaintiff, and to take necessary corrective actions or to terminate the surgery. The plaintiff would show that this negligence has resulted in severe loss of vision in his right eye.

16. The plaintiff further alleges that the operating surgeon, Wolfson, in the absence of an anesthesiologist was in control of the administration of the anesthesia by the nurse anesthetist, and any negligence of the nurse anesthetist is imputable to both the operating surgeon, Wolfson, and the anesthesiologist, Phythyon.

Wolfson's answer denies that Wolfson contacted an anesthesiologist of his choice and denies all allegations of negligence made against him. The answer further avers that plaintiff was guilty of contributory negligence.

Wolfson filed a motion for summary judgment and in support thereof relies primarily upon the pleadings, his affidavit and discovery depositions.

In opposition to the motion for summary judgment, plaintiff filed the affidavit and the discovery and evidentiary depositions of James Pearson, M.D., an anesthesiologist.

---

1. Subsequent to the filing of the complaint, plaintiff died and the present plaintiff, Sammie Lee Goodman, Executrix, was substituted as plaintiff. References to plaintiff will mean the original plaintiff unless the context otherwise indicates.

The testimony of defendant Dr. Wolfson established by his affidavit and deposition is as follows:

Nurse Anesthetist Rex Leatherwood is a certified registered nurse anesthetist and was chosen by the Edgefield Hospital to administer the anesthesia for plaintiff's cataract surgery. Nurse Leatherwood sedated the plaintiff with an I.V. medication and Wolfson then administered a retrobulbar block. The anesthetic agents were selected by Leatherwood and the administration of the anesthetic was entirely in the hands of Leatherwood. After administering the retrobulbar block the surgery began and the eye was entered during which time plaintiff was awake and the procedure continued without any problem. As Wolfson began the anterior capsulotomy, plaintiff became uncooperative, although he was instructed not to move. Initially, plaintiff complied with the instructions and the capsulotomy was completed without incident. As the surgery continued, plaintiff again became agitated and began to move at which time Wolfson immediately stopped the operative procedure to allow the anesthetic team to evaluate the patient. We quote from the affidavit:

... The operation was immediately stopped so the anesthetic team could re-evaluate the patient. This was necessary since the anesthetic team's control of the patient was my number one priority. The operation was stopped to give them complete control. Often it is necessary to move drapes and communicate directly with the patient during the evaluation period. This activity can interfere with the operation, so I stopped to give the anesthetic team priority. I asked Mr. Leatherwood if he would like Dr. Phythyon called into the room. I was concerned since Mr. Goodman had moved during capsulotomy and with this second movement I wanted to give the anesthetic team every opportunity to determine their control of the patient before continuing. Mr. Leatherwood, who is trained to monitor and assess the patient's status and control, did so. Mr. Leatherwood is also trained to know when to ask for help and anesthesiologist support, and he clearly stated that this was not needed. His comment was that Dr. Phythyon was not needed. The anesthetist's assessment was that Mr. Goodman was apparently in good control and that I should proceed....

After being assured by Leatherwood that the operation could proceed, Wolfson again re-entered the eye. Plaintiff again became uncooperative and attempted to move off the operative table which resulted in the damage to his eye. Plaintiff was immediately put under general anesthetic by the nurse anesthetist Leatherwood and attempts were made to save the eye.

The affidavit further states that the nurse anesthetist was employed by the Miller Medical Group and/or Edgefield Hospital and furnished by the hospital for the Goodman operation. He deposes that he had no control over the selection of the anesthetic or the methods, means or procedures for the administration of same. The affidavit concludes:

In performing the surgery described in the preceding paragraph, I, at all times, acted in accordance with generally accepted ophthalmology standards for the Nashville–Davidson County, Tennessee community. All of the treatments given, tests ordered, examinations and diagnosis made, and surgery performed by me were in the exercise of my sound medical judgment; were appropriate and medically advisable; and in rendering same I exercised that degree of care and skill ordinarily exercised by other ophthalmologists in good standing under the same or similar circumstances in the Nashville–Davidson County, Tennessee community.

In opposition to Wolfson's motion for summary judgment, plaintiff relies upon the affidavit, discovery deposition and evidentiary deposition of James Pearson, M.D., a anesthesiologist from Birmingham, Alabama.

Pearson's affidavit states that he is a physician practicing the specialty of anesthesiology at the pertinent times and is familiar with the recognized standard of acceptable professional practice in the field of

anesthesiology for the community of Jefferson County, Alabama, which is similar in size to Davidson County, Tennessee. He also states that he is familiar with the standards of acceptable professional practice for certified registered nurse anesthetists in Birmingham, Alabama. The affidavit further states that defendant Phythyon, the anesthesiologist, and defendant Leatherwood, the nurse anesthetist, did not exercise the degree of care required. The affidavit states further:

> ... Both Rex Leatherwood, C.R.N.A., and Glenn Wolfson, M.D., I feel, are responsible for this unacceptable standard of care, both of whom profess expertise in the area of management of cataract patients, and yet, failed to halt a procedure on a man that was uncooperative, for whatever reason, and proceed with a more suitable anesthetic technique.

Dr. Pearson states unequivocally, in both his discovery deposition and his evidentiary deposition, that he is not familiar with the standard of care required in the practice of ophthalmology. We quote from his discovery deposition.

Q. Now, do you profess any expertise in ophthalmology?

A. I do not.

Q. Do you profess any surgical expertise at all?

A. I do not, no.

Q. Well, are you of the opinion or are you going to offer an opinion that the surgeon in this case violated any standard of acceptable medical practice in Nashville, Tennessee in 1987?

A. It's a difficult question. And the reason is that both Dr. Wolfson and Rex Leatherwood were present. Both of them were aware of the events that were going on. I'm sure Dr. Wolfson has been involved with patients like Mr. Goodman before.

Q. You assume that?

A. Yeah. I have to assume it with his years of training and his practice. And I hope he appreciated the difficulty that Mr. Clinton Goodman was giving him, and maybe he didn't. I don't know. *Whether or not he violated the standard of care for an ophthalmologist, I can't render a professional opinion on that. I really can't.* I, however, would—Any time I work with a surgeon and the surgeon feels the patient is uncooperative and can't perform what he needs to do, then he'll express to me, Hey, listen, I need some help. This guy is—delicate part of the procedure. I need something else, whatever it is. (Emphasis added).

\* \* \* \* \* \*

Q. Are you knowledgeable about the practice of surgery and ophthalmological surgery?

A. No.

Q. In Nashville or anywhere else are you aware of the standards?

A. No, not the standards for ophthalmological surgery, no.

We quote from Dr. Pearson's evidentiary deposition:

Q. And you don't claim to know the standards or the acceptable standards of care for the practice of ophthalmology, do you?

A. I do not. (Emphasis added).

Although Dr. Pearson makes generalized statements concerning the deviation from the standard of care for medical practice in general, he fails to address Dr. Wolfson's affidavit statement that he was entitled to and did rely upon the assurance of the qualified nurse anesthetist that plaintiff was properly sedated and under control sufficiently for Wolfson to continue the operation. Wolfson explicitly states that his conduct, including his reliance upon the assurance of the nurse anesthetist, is in conformance to the recognized standard of care for the practice of ophthalmological surgery in Nashville, Tennessee. Dr. Pearson did note in his evidentiary deposition that it was not the duty of the surgeon to determine what anesthetic agents should be used prior to and during surgery and that the sedation of the patient is peculiarly under the control and supervision of the anesthetic team.

■ T.C.A. § 29–26–115 (1980) provides in part:

**29-26-115. Claimant's burden in malpractice action—Expert testimony—Presumption of negligence—Jury instructions.**—(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

(1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;

(2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

(3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

(b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a) unless he was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make his expert testimony relevant to the issues in the case and had practiced this profession or specialty in one of these states during the year preceding the date that the alleged injury or wrongful act occurred. . . .

\*      \*      \*      \*      \*      \*

Plaintiff asserts that he has carried the burden of proof placed upon him by the statute and that Dr. Pearson's testimony establishes a genuine issue of material fact. In support of his assertion, he relies upon *Stokes v. Leung*, 651 S.W.2d 704 (Tenn.App.1982); *Searle v. Bryant*, 713 S.W.2d 62 (Tenn.1986); and *Ledford v. Moskowitz*, 742 S.W.2d 645 (Tenn.App. 1987). We certainly have no quarrel with the holdings in the cases relied upon by plaintiff, but believe that plaintiff's reliance on the cases is misplaced.

*Stokes v. Leung*, 651 S.W.2d 704 (Tenn. App.1982), involved the question concerning the care and treatment of a suicidal psychiatric patient by the defendant physician who was an internal medicine cardiology specialist. Plaintiff offered the testimony of a doctor who specialized in psychiatry and defendant objected to the testimony on the ground that the doctor was not qualified to give an opinion with respect to the standard of care and the deviation therefrom in the medical field of the defendant. The psychiatrist specifically testified that in addition to being familiar with the standard of practice of psychiatry, he was familiar with the standard of practice "with regard to psychiatric patients in general medicine." The Court held that his opinion was therefore admissible and the objection went more to the weight of the evidence rather than its admissibility.

In *Searle v. Bryant*, 713 S.W.2d 62 (Tenn.1986), the issue was whether an infectious disease specialist and clinical microbiologist was qualified to testify as an expert for negligent treatment of the surgical wound which became infected. The expert, Dr. Stratton, testified that he was an infectious disease specialist and clinical microbiologist. He stated that he was the Director of the Clinical Microbiology Laboratory in Vanderbilt and that he performed infectious disease consultations. He also stated that he was familiar with the standard of acceptable medical practice in the Middle Tennessee area, but that he did not perform surgery. The Court held:

> The statute contains no requirement that the witness practice the same specialty as the defendant. The issue at trial was whether the defendant's performance in attempting to prevent the surgical wound infection and in treating it after it developed was negligent. Dr. Stratton stated that he was familiar with the applicable standards of surgeons in the prevention and treatment of surgical wound infections, and his testimony supports that statement. His expert testimony was, therefore, relevant to the issues in the case. For that reason, he was competent to testify as to those standards,

even though he was not himself a surgeon.

713 S.W.2d at 65.

*Ledford v. Moskowitz,* 742 S.W.2d 645 (Tenn.App.1987), was a malpractice action brought against a psychiatrist whose prescription allegedly caused an adverse reaction in the plaintiff. This Court, in reversing summary judgment granted by the trial court, held that the testimony of the neurologist who subsequently treated plaintiff was sufficient to create an issue of material fact as to the standard of care required in the psychiatric practice in the community where the alleged malpractice occurred. The neurologist testified that he was Board certified in neurology and psychiatry and part of his training in neurology was in psychiatry. He also testified that he kept up with the literature and that he was familiar with the standard of care in small towns all over the State of Georgia and thus was familiar with the standard of care in Durktown and Cleveland, Tennessee, "in a broad sense." He testified as to the familiarity with misprescribed medicine, with the restrictions on their use and the necessity for close supervision. The court held that these facts "make his testimony 'relevant to the issue in the case.'" The Court stated:

> ... [t]hat taken as a whole, Stewart's [plaintiff's expert] proof creates a material issue of fact on the standard of acceptable psychiatric practice in similar communities to those found in the Polk, McMinn and Bradley county area. Although medical malpractice actions impose a more rigorous procedural requirement on the Plaintiff, once the threshold of proof has been crossed; as it has been here by Plaintiffs' expert Stewart then the case should proceed to trial on the merits.

742 S.W.2d at 649.

■ In the above cases, although the courts accepted the testimony of medical experts in other fields as competent proof on the standard of care, the experts testified as to their familiarity with the defendant's field of practice and the standard of care required in dealing with the specific acts involved on the part of the defendant physician. In the case at bar, Dr. Pearson' testimony did not rise to this level. Although there is no requirement under the statute that the witness practice the same specialty as the defendant, the witness must be sufficiently familiar with the standard of care of the specialist and be able to give relevant testimony on that subject. See *Cardwell v. Bechtol,* 724 S.W.2d 739, 754 (Tenn.1987). In the case at bar, Wolfson established that the standard of care in the community where he practiced was to rely on the assurance of the anesthetic team that the patient was under control and properly sedated. From our review of the affidavit and depositions of Dr. Pearson, we cannot find that there is any countervailing proof which would create a material issue of fact. Reading Dr. Pearson's affidavit and depositions as a whole, it is clear that Dr. Pearson recognizes the role of the anesthetic team and the responsibility placed upon them in the surgical arena, and most certainly recognizes that the administration of the anesthetic and the control of the patient is within the field and purview of the practice of anesthesiology.

Summary judgment is to be rendered by a trial court only when it is shown that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn.R.Civ.P. 56.03 (1984). In ruling on a motion for summary judgment, the trial court and the Court of Appeals must consider the matter in the same manner as a motion for a directed verdict made at the close of the plaintiff's proof, i.e., all the evidence must be viewed in the light most favorable to the opponent of the motion and all legitimate conclusions of fact must be drawn in favor of the opponent. It is only when there is no disputed issue of material fact that a summary judgment should be granted by the trial court and sustained by the Court of Appeals. *Graves v. Anchor Wire Corp. of Tennessee,* 692 S.W.2d 420 (Tenn.App.1985); *Bennett v. Mid–South Terminals Corp.,* 660 S.W.2d 799 (Tenn.App.1983).

T.C.A. § 29–26–115 "[p]rovides unequivocally that each of the three basic elements

of a medical malpractice action—the standard of care, the breach of the standard, and proximate cause—be proven by testimony of experts...." *Payne v. Caldwell,* 796 S.W.2d 142, at 143 (Tenn.1990).

 In the case at bar, the plaintiff simply failed to controvert Wolfson's affidavit testimony that the standard of care in the practice of ophthalmology is to accord the anesthetic team the supervision and control of the patient's sedation and failed to controvert that Wolfson conformed to that standard. Plaintiff's complaint is subject to summary dismissal if the plaintiff, after being given a reasonable opportunity, has failed to established an essential element of the case in which the plaintiff will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Stanley v. Joslin,* 757 S.W.2d 328, 330 (Tenn.App.1987); *Moman v. Walden,* 719 S.W.2d 531, 533 (Tenn.App. 1986).

Accordingly, the order of the trial court granting summary judgment to the defendant is affirmed and this case is remanded for such further proceedings as may be necessary. Costs of appeal are assessed against the appellant.

HIGHERS and FARMER, JJ., concur.