FREDA G. MOON,                          )
                                        )
        Executor of the                 )
        Estate of RUTH GARRETT,         )
                                        )
        Plaintiff/Appellant,            )       Appeal No.
                                        )       01-A-01-9609-CV-00389
v.                                      )
                                        )       Davidson Circuit
ST. THOMAS HOSPITAL,                    )       No.    87C-239
                                        )
        Defendant/Appellee.             )

FILED

April 25, 1997

Cecil W. Crowson
Appellate Court Clerk

COURT OF APPEALS OF TENNESSEE

MIDDLE SECTION AT NASHVILLE

APPEAL FROM THE CIRCUIT COURT FOR DAVIDSON COUNTY

AT NASHVILLE, TENNESSEE

THE HONORABLE BARBARA N. HAYNES, JUDGE


HARLAN DODSON, III
ANNE C. MARTIN
JULIE K. SANDINE
Dodson, Parker & Behm
306 Gay Street
400 Realtors Building
P. O. Box 198066
Nashville, Tennessee  37219
        ATTORNEYS FOR PLAINTIFF/APPELLANT


MARY MARTIN SCHAFFNER
Howell & Fisher
Court Square Building
300 James Robertson Parkway
Nashville, Tennessee  37201-1107
        ATTORNEY FOR DEFENDANT/APPELLEE


AFFIRMED AND REMANDED


SAMUEL L. LEWIS, JUDGE

# OPINION

This law suit arose out of the death of Ray Elmer Garrett which occurred while he was a patient at St. Thomas Hospital, the defendant below. Finding that, as a matter of law, the events surrounding Mr. Garrett's death were not reasonably foreseeable, the Davidson County Circuit Court granted the defendant hospital summary judgment. Freda Moon[1], the decedent's daughter, has appealed to this court arguing that this was not a proper case for summary judgment. We disagree. Accordingly, we affirm the decision of the trial court.

On 6 February 1986, Mr. Garrett was admitted to the defendant hospital where he underwent coronary bypass surgery the following day. During surgery, Mr. Garrett was orally intubated with an endotracheal tube[2] -- a tube placed in his throat leading to his lung area which was used to provide him with the necessary oxygen. After a successful surgery, Mr. Garrett was taken to the recovery room where his condition was considered stable.

At approximately 12:00 a.m. on the morning following Mr. Garrett's surgery, the nurse assigned to him, Patricia Hoeflein, observed that Mr. Garrett became agitated and restless when she attempted to suction his lungs.[3] She stated that he bit on his endotracheal tube two times but that he ceased biting when she was finished suctioning. In response to Mr. Garrett's fidgeting with the wires to which he

---

[1]Ms. Moon was substituted for the original plaintiff, Ruth F. Garrett, the surviving widow of Ray Elmer Garrett, in 1990 following Ms. Garrett's death.

[2]The endotracheal tube was manufactured by Bivona, Inc. which was formerly a defendant in this suit until the case against it was dismissed by summary judgment.

[3]Nurse Hoeflein described the suctioning procedure as follows: "we use the bag, which is hooked up to 100 percent oxygen and has an adapter on the end that you place on the endotracheal tube and you bag the patient, or pump the patient several times to give him quick amounts of oxygen. You take that off and you have a sterile technique and you slide a catheter down the endotracheal tube and as you pull back out you apply suction which is hooked up to the wall to eliminate mucous from the patient's trachea and lung area."

was hooked, Nurse Hoeflein put him in soft arm restraints to prevent him, once he awakened, from pulling at these wires. She stated that this was a common procedure with post-operative patients. For the next hours, while she continued to care for him, she noticed no signs of agitation. Almost two hours after Nurse Hoeflein suctioned Mr. Garrett, she left his room for approximately thirty seconds and returned upon being alerted that Mr. Garrett had bitten his tube.

At 1:40 a.m., just before Mr. Garrett bit his tube, Ronald McKay, a respiratory technician, decreased the percentage of oxygen that Mr. Garrett was receiving. At this time, Mr. McKay checked the condition of the endotracheal tube and noticed no indication of chewing or biting. Ten or eleven minutes later at 1:50 a.m., Mr. McKay responded to an alarm in Mr. Garrett's room and discovered that he had bitten his tube almost in two. Mr. McKay left the room seeking assistance from the supervising respiratory technician. When Mr. McKay momentarily returned with another respiratory technician, Byron Kaelin, and the respiratory therapy supervisor, Gene Emerson, Mr. Garrett had completely bitten the tube in half. Though Mr. Garrett's jaws were clamped shut, the men were able to force an airway tube through. However, they could not remove a piece of the severed tube from Mr. Garrett's throat. A physician, Dr. Lee, arrived and extracted the severed tube. Unfortunately, Mr. Garrett suffered a heart attack during this process and he was unable to be revived.

Both Nurse Hoeflein and Mr. McKay testified at depositions that they had never seen a patient bite through an endotracheal tube before, and Mr. McKay added that this was the first time he had ever heard of such an incident. Though Nurse Hoeflein was familiar with the use of bite blocks to prevent a seizing patient from biting on his endotracheal tube, she testified that she had not felt that it was necessary

to use a bite block or an oral airway in the case of Mr. Garrett. She testified that in her six and a half years of critical care nursing, she had only used a bite block for one type of patient -- one who was continuously seizing. She stated that, in her experience, the only patients who continuously chewed on their tubes were those who were seizing. For the majority of patients who were chewing on their endotracheal tubes, Nurse Hoeflein testified that her approach would be to calm them down and to orient them with regard to the tube. If a patient were chewing on a tube to the point that they were incoherent and uncooperative, she might sedate them with medication. If a patient's chewing were interfering with the delivery of oxygen, she might put in an oral airway which she had commonly used "to prevent patients who continually bite on their endotracheal tube to the point they are preventing the air line delivering the breath and oxygen they need."

Mr. Emerson testified that he had never seen nor heard of a patient causing a defect in an endotracheal tube by gnawing or chewing on the tube. He stated that part of his duty as a respiratory therapist was to suction patients who have endotracheal tubes and that it was "fairly common" for these patients to gnaw on the tubes while being suctioned. He added that if a patient's gnawing was caused by the suctioning and if it stopped when the suctioning stopped, no precautions were taken to prevent the patient from biting the tube.

Nurse Hoeflein and Mr. Emerson both testified that they did not recall personally using a bite block before the incident. They stated that though St. Thomas had not generally used bite blocks before the incident, it had used them with most patients since that time. Mr. Emerson testified that, following the incident, the hospital adopted a policy to use a bite block or oral airway with any orally-intubated

patient who has teeth. Mr. Emerson said that he had not used bite blocks or oral airways for patients with endotracheal tubes at either of his two places of previous employment.

In presenting its case, the defendant relied heavily upon the affidavit of Clifton W. Emerson, M.D., an anesthesiologist with Cardiovascular Anesthesiologists, P.C., and one of the doctors directly responsible for managing Mr. Garrett's anesthesia and supervising his post-operative care. Dr. Emerson testified that "patients can intermittently bite on the endotracheal tube and interrupt the ventilatory flow [but that s]uch biting, which frequently occurs when the patient is being suctioned, is not considered problematic unless the anesthesiologist anticipates the patient might experience seizures." Dr. Emerson testified that "[i]f the anesthesiologist anticipates the patient may bite down on the tube sufficient to interrupt air flow, he/she will order a bite block or oral airway to be used in order to enable the endotracheal tube to deliver appropriate ventilatory support to the patient." Such a decision is a medical decision and as such, absent an emergency, it would have been inappropriate for hospital personnel to utilize a bite block or oral airway for Mr. Garrett without an order from one of the anesthesiologists. He added that "[b]iting on a tube during suctioning is an ordinary, everyday event and, in no way represents" such an emergency.

Dr. Emerson stated that though he had been involved in over 20,000 open heart procedures, prior to Mr. Garrett's surgery, he was totally unaware that a Fome-Cuf endotracheal tube could be bitten in two by a patient. He "had never known nor [had he] ever heard of a patient completely transecting an endotracheal tube as did Mr. Garrett." He stated that based on his experience and training, "it was not

reasonably foreseeable that Mr. Garrett would bite his endotracheal tube in two." Indeed, Dr. Emerson felt that the incident was "such a 'freak' accident that, even today, [he does] not routinely use bite blocks for post-anesthesia patients."

The defendant's testimony revealed certain disadvantages of oral airways and bite blocks. Nurse Hoeflein testified that an oral airway was not only uncomfortable but that it had the potential to make a patient gag which might lower his heart and blood pressure. As for a bite block, it also is uncomfortable for a patient. Additionally, prolonged use of a bite block can cause ulceration of the mouth.

To support her position, the plaintiff relies upon the affidavits of Joseph William Rubin, M.D., C.M., a cardiovascular surgical specialist, as well as those of two critical care nurses, Nell S. George and Veronica Varallo. While both Dr. Rubin and Nurse George were contacted through an expert witness service, Nurse Varallo, who actually worked at St. Thomas in the critical care unit from 1992 to November of 1994, was contacted through a former employer. All three of these experts opined that the bedside care of Mr. Garrett fell below the recognized standard of acceptable professional practice in the profession and the specialty of the critical care of patients. Each one stated in his affidavit that, after reviewing these records, it was his opinion that "[w]hen the bedside nurse observed Mr. Garrett biting his endotracheal tube at [12:45 a.m.], she should have either used a bite block or repositioned the tube to keep him from further biting or contacted the treating physician so that he could make that decision."

Dr. Rubin's second affidavit stated that "[t]he medical records in this case

indicate that the bedside nurse knew Mr. Garrett was biting his endotracheal tube during his recovery from surgery [and that b]ased on the records, it was foreseeable that the endotracheal tube could become occluded or impaired." In his third and final affidavit, Dr. Rubin again stated that his opinion was based on medical records "which indicate that the bedside nurse knew Mr. Garrett was agitated and biting his endotracheal tube during his recovery from surgery." In addition, he stated that attending medical personnel have a duty to ensure that a patient's endotracheal tube is not blocked or damaged and that when a patient displays agitated and biting behavior, there exists a further duty to prevent damage. "One such preventive measure is repositioning of the endotracheal tube, which decreases the extent of damage to one specific part of the tube by teeth biting, thereby decreasing the likelihood of the tube being severed in two. Another preventive measure is the use of a bite block." He testified that the decision of whether or not to use a protective device or whether or not to reposition a tube is an appropriate decision for a critical care nurse. In conclusion, it was Dr. Rubin's opinion that, "[u]nder the circumstances of this case, it was reasonably foreseeable that Mr. Garrett would lose ventilatory support due to his transection of the endotracheal tube and, as a result, be unable to breathe and die."

The plaintiff submits that her evidence directly contradicts that of the defendant and that it expressly demonstrates that inferences and conclusions contrary to those of the defendant's expert witnesses have been reasonably drawn from the facts of this case. As such, the plaintiff asserts that this is not a proper case for summary judgment which is to "be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party

is entitled to a judgment as a matter of law. " Tenn. R. Civ. P. 56.03. In other words, summary judgment is appropriate when two prerequisites are met. First, there must be no genuine issue as to any fact necessary to resolve the substantive claim or defense embodied in the summary judgment motion, **Byrd v. Hall,** 847 S.W.2d 208, 210 (Tenn. 1993), and second, the moving party must be entitled to a judgment as a matter of law. **Mansfield v. Colonial Freight Sys.**, 862 S.W.2d 527, 530 (Tenn. App. 1993). As our supreme court has stated "[t]he issues that lie at the heart of evaluating a summary judgment motion are: (1) whether a *factual* dispute exists; (2) whether the disputed fact is *material* to the outcome of the case; and (3) whether the disputed fact creates a *genuine* issue for trial." **Byrd**, 847 S.W.2d at 214.

The legal principles which guide an appellate court's review of a trial court's grant of a motion for summary judgment are well settled. Because the trial court's decision involves only a question of law, there is no presumption of correctness attached to this decision. **Hembree v. State**, 925 S.W.2d 513, 515 (Tenn. 1996). This court need only review the record to determine whether the requirements Rule 56 have been met. **Carvell v. Bottoms**, 900 S.W.2d 23, 26 (Tenn. 1995). In so doing, we must view the evidence in the light most favorable to the nonmoving party, allow all reasonable inferences in favor of that party, and discard all countervailing evidence. **Id.** (citing **Byrd**, 847 S.W.2d at 210-11). Summary judgment should be granted if the facts and conclusions permit a reasonable person to reach only one conclusion. **McCall v. Wilder**, 913 S.W.2d 150, 152 (Tenn. 1995).

Once it is shown by the moving party that there is no genuine issue of material fact, the nonmoving party must then demonstrate, by affidavits or discovery materials, that there is a genuine, material fact dispute to warrant a trial. **Byrd**, 847

S.W.2d at 211; *see* Tenn. R. Civ. P. 56.05. For Mr. Garrett's burden in this case, we turn to the substantive law regarding medical malpractice which is outlined in Tennessee Code Annotated section 29-26-115:

> (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):
> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.
> (b) No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a) unless he was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make his expert testimony relevant to the issues in the case and had practiced this profession or specialty in one of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.

The outcome of this case is contingent upon the "recognized standard of acceptable professional practice" and whether the defendant hospital acted in accordance with this standard. *Id.* § 29-26-115(a)(1) - (a)(2). We note that absent a finding that the defendant owed Mr. Garrett a duty involving the protection of his endotracheal tube from being bitten in two, it is irrelevant that protective measures such as a bite block or an oral airway would have prevented the transection of the tube. The plaintiff must show that, under these facts, the defendant hospital owed the plaintiff a duty of care. As in all negligence cases, there is a duty to exercise reasonable care under the circumstances. *Pittman v. Upjohn Co.*, 890 S.W.2d 425, 428 (Tenn. 1994) (citing *Doe v. Linder Constr. Co.*, 845 S.W.2d 173, 177

(Tenn.1992)).   In *Doe*, the court explained:

> The term reasonable care must be given meaning in relation to the circumstances.   Ordinary, or reasonable, care is to be estimated by the risk entailed through probable dangers attending the particular situation and is to be commensurate with the risk of injury.  The risk involved is that which is foreseeable;  a risk is foreseeable if a reasonable person could foresee the probability of its occurrence or if the person was on notice that the likelihood of danger to the party to whom is owed a duty is probable.  Foreseeability is the test of negligence.   If the injury which occurred could not have been reasonably foreseen, the duty of care does not arise, and even though the act of the defendant in fact caused the injury, there is no negligence and no liability.  '[T]he plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility, and that some action within the [defendant's] power more probably than not would have prevented the injury.' . . .  The pertinent question is whether there was any showing from which it can be said that the defendants reasonably knew or should have known of the probability of an occurrence such as the one which caused the plaintiff's injuries.

*Id*. at 178 (citations omitted).   *See Pittman*, 890 S.W.2d at 431 (finding that defendant drug company was entitled to summary judgment as there was no genuine issue of disputed, material fact with regard to the duty of care it owed to warn in this case and that its warning was sufficient as a matter of law).

In this case, the risk of injury was the risk of the patient biting through his endotracheal tube.  We must determine whether the plaintiff's evidence in the form of the affidavits of Nurse George, Nurse Varallo, and Dr. Rubin establishes that there is a genuine, material fact dispute as to whether the defendants reasonably knew or should have known of the probability of such an occurrence.  We begin by an examination of the plaintiff's experts' opinions.  All three experts gave their opinions that the bedside care of Mr. Garrett fell below the recognized standard of acceptable professional practice in the profession and the specialty of the critical care of patients.  Each stated that "[w]hen the bedside nurse observed Mr. Garrett biting his endotracheal tube . . ., she should have either used a bite block or repositioned the

tube to keep him from further biting or contacted the treating physician so that he could make that decision."  In addition, Dr. Rubin stated that attending medical personnel have a duty to ensure that a patient's endotracheal tube is not blocked or damaged and that when a patient displays agitated and biting behavior, there exists a further duty to prevent damage which can be satisfied by repositioning the tube or using a bite block.  Only Dr. Rubin directly addressed the issue of foreseeability in opining that, based on medical records which indicate that the bedside nurse knew Mr. Garrett was biting his endotracheal tube during his recovery from surgery, it was foreseeable that the endotracheal tube could become occluded or impaired.

We find that the opinions espoused in the plaintiff's experts' affidavits are inadequate for several reasons, the first of which is their failure to describe the standard of care in Nashville, Tennessee.  In *Moore v. Walwyn*, No. 01A01-9507-CV-00295, 1996 WL 17143 (Tenn. App. 1996), this court upheld the grant of summary judgment to a defendant doctor basing its decision in part on the failure of the plaintiff's expert "to establish a material dispute as to deviation from the standard of care."  *Id.* at *5.  The expert stated as follows:  "In my opinion, intravenous antibiotics should have been given at the time of the operation of 5/2/93, as well as the operation of 5/5/93....  In my opinion, it fell below the standard of care for a surgeon to do these operations without standard antibiotic prophylaxis."  *Id.* at *4.  The court stated that the doctor's "statement does not describe the standard in Nashville or explain that it is the standard in a similar community.  Moreover, the statement does not even describe a 'standard of acceptable professional practice.'"  *Id.* Dissenting on other grounds, Judge Koch agreed that "the omission of any reference to the appropriate recognized standard of professional practice in Nashville or similar communities as required by Tenn. Code Ann. Sec. 29-26-115(a)(1)" was a "material

-11-

shortcoming" in the plaintiff's expert opinion. *Id.* at *12 (Koch, J., dissenting).

In the case at bar, the plaintiff's evidence makes no reference to the appropriate recognized standard of professional practice in Nashville. Instead, all three experts make a general reference to the recognized standard of acceptable professional practice and assert their views of what actions the attending nurse should have taken to properly care for Mr. Garrett. This court has stated that "[t]he testimony of a physician as to what he would do or his opinion of what should have been done does not prove the statutory standard of medical practice." *Roddy v. Volunteer Med. Clinic, Inc.*, 926 S.W.2d 572, 578 (Tenn. App. 1996) (quoting *Lewis v. Hill*, 770 S.W.2d 751 (Tenn. App.1988)); *see Goodman v. Phythyon*, 803 S.W.2d 697, 700 (Tenn. App. 1990) (finding "generalized statements concerning the deviation from the standard of care for medical practice" inadequate where the plaintiff's expert failed to address the defendant doctor's assertion that his actions complied with the standard of care).

In comparison to the plaintiff's lack of evidence on the acceptable standard of care in Nashville, the testimony of the defendant's experts, all of whom were employed in the Nashville area, indicates that acceptable practice did not mandate they take any further protective action for a patient who had become momentarily agitated during suctioning and bitten down two times on his endotracheal tube. Nurse Hoeflein stated that in her six and a half years as a critical care nurse, she had only used a bite block for a patient who was continuously seizing. Neither she nor Mr. Emerson could recall personally using one of these devices nor did the defendant hospital generally utilize such devices prior to this incident. Dr. Emerson, Nurse Hoeflein, and Mr. Emerson were in accord in their assertions that it was common for

patients who were being suctioned to gnaw on their endotracheal tubes during the suctioning process. Because this gnawing was not considered problematic, both Dr. Emerson and Mr. Emerson stated that no precautions were taken when a patient displayed such behavior. To the contrary, Dr. Emerson considered it a "freak accident" for a patient to bite through an endotracheal tube. Indeed, the transection of an endotracheal tube seems to have been an unprecedented occurrence. Neither Nurse Hoeflein, Mr. McKay, Mr. Emerson nor Dr. Emerson, who had performed over 20,000 open heart procedures, had ever experienced or heard of an endotracheal tube being completely bitten in two.

Thus, a review of the defendant's expert proof reveals that the recognized standard of professional practice did not necessitate further action because the transection of the tube was completely unforeseeable. As is quoted above from our state's supreme court, "[i]f the injury which occurred could not have been reasonably foreseen, the duty of care does not arise . . . '[T]he plaintiff must show that the injury was a reasonably foreseeable probability, not just a remote possibility.'" **Doe**, 845 S.W.2d at 178. Here, the proof does not even establish that the defendant medical staff should have considered this injury a remote possibility. Therefore, we conclude not only that the plaintiff's evidence fails to describe the standard of care in Nashville, Tennessee, but that the defendant's uncontroverted proof demonstrates that no duty existed because no reasonable person could have foreseen the probability of Mr. Garrett biting the endotracheal tube in two.

In reaching this conclusion, we acknowledge Dr. Rubin's assertion that based on medical records which indicate that the bedside nurse knew Mr. Garrett was biting his endotracheal tube during his recovery from surgery, "it was foreseeable that

the endotracheal tube could become occluded or impaired." However, we do not find that Dr. Rubin's opinion substantiates the plaintiff's burden of foreseeability. Indeed, this opinion exemplifies another defect in the plaintiff's evidence -- the inaccuracy of the factual predicate upon which the plaintiff's experts drew their conclusions.

The undisputed facts in this case show that Mr. Garrett briefly displayed agitated behavior while his lungs were being suctioned at which time he bit down on his endotracheal tube two times. All of the defendant's experts agree that such agitation is a common reaction for patients whose lungs are being suctioned. The proof showed that Mr. Garrett's agitated behavior ceased as soon as the suctioning ceased and that the medical personnel noted no further indication of such behavior until he bit the tube in half almost two hours later.

As stated above, all three of the plaintiff's experts opined that "[w]hen the bedside nurse observed Mr. Garrett biting his endotracheal tube at [12:45 a.m.],[4] she should have either used a bite block or repositioned the tube to keep him from further biting or contacted the treating physician so that he could make that decision." In addition, Dr. Rubin stated that attending medical personnel have a duty to prevent damage to an endotracheal tube when a patient displays agitated and biting behavior. Indeed, he prefaced his opinion in his third affidavit by stating that it was based on Mr. Garrett's medical records "which indicate that the bedside nurse knew Mr. Garrett was agitated and biting his endotracheal tube during his recovery from surgery." According to the opinions espoused by these experts, the actions they advocate are clearly contingent upon the patient being in an agitated state. However, the facts

_____

[4]We point out that the evidence was not that Mr. Garrett was biting his tube at 12:45 a.m. as stated in all three experts' opinions. Rather, Nurse Hoeflein testified that he bit his tube two times around 12:00 a.m.

were that Mr. Garrett was only momentarily in an agitated state almost two hours before the incident. His agitation was induced by a medical procedure which typically caused agitation, and when the procedure was completed, Mr. Garrett showed no further signs of agitation.

Rule of Civil Procedure 56.05 provides in part that "[e]xpert opinion affidavits shall be governed by Tennessee Rule of Evidence 703" which states as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703. In this case, the opinions expressed by the plaintiff's experts are not based upon the facts of this case. If opinion testimony must be disallowed when the underlying facts indicate a lack of trustworthiness, it certainly must be disallowed when the underlying facts are inaccurate. Moreover, opinions which are not based upon the facts of a particular case are inadmissible as irrelevant evidence. *See* Tenn. R. Evid. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Because the experts' opinions regarding the duty owed an agitated patient have no bearing on the determination of whether there is a duty in the present case, this evidence is irrelevant. ***See State v. Campbell***, 904 S.W.2d 608, 616 (Tenn. Crim. App. 1995) (upholding lower court exclusion of expert testimony where "trial court correctly found that the proposed testimony of the psychologist would not substantially assist the jury to understand the proof that had been adduced during the

trial or to resolve any fact in issue").

In upholding the trial court's grant of summary judgment in this case, we note that our courts have long espoused the view that summary judgment should be entered cautiously in particular kinds of cases, of which medical malpractice is a prime example. *See Bowman v. Henard*, 547 S.W.2d 527, 530 (Tenn. 1977); *Ledford v. Moskowitz*, 742 S.W.2d 645, 649 (Tenn. App. 1987); *see also Blocker v. Regional Med. Ctr.*, 722 S.W.2d 660, 662 (Tenn. 1987) (reversing the summary judgment in a worker's compensation case involving the commencement of the statute of limitations and noting that such cases most often are factual in nature). The rationale behind this notion stems from the fact that the basic elements in a medical malpractice case must be proven by expert medical evidence in the form of opinion testimony. *See* Tenn. Code Ann. § 29-26-115(b); *Payne v. Caldwell*, 796 S.W.2d 142, 143 (Tenn. 1990); *Hartsell v. Fort Sanders Reg'l Med. Ctr.*, 905 S.W.2d 944, 950 (Tenn. App. 1995), *cert. denied*, 116 S. Ct. 1352 (1996). "Because opinion testimony always is subject to evaluation by the fact finder, it generally has been held not an appropriate basis for summary judgment." *Bowman*, 547 S.W.2d at 530.

However, the court in *Bowman* noted an exception to this general rule: "in those malpractice actions wherein expert medical testimony is required to establish negligence and proximate cause, affidavits by medical doctors which clearly and completely refute plaintiff's contention afford a proper basis for dismissal of the action on summary judgment, in the absence of proper responsive proof by affidavit or otherwise." *Id.* at 531. More recently, this court has stated that grants of summary judgment "have proven particularly useful in medical malpractice cases . . . [w]hen the issue is properly raised and it is shown prior to trial that the plaintiff cannot meet

that burden [imposed on the plaintiff by the legislature]." ***Walker v. Bell***, 828 S.W.2d 409, 411 (Tenn. App. 1991). We believe that this is a case where the plaintiff cannot meet the burden of showing medical malpractice.

The plaintiff's evidence in this case fails to demonstrate a genuine material fact dispute with regard to whether the defendant complied with the recognized standard of acceptable professional practice in Nashville, Tennessee. The expert affidavits presented by the plaintiff do not establish that the occurrence which caused Mr. Garrett's death was foreseeable or that the appropriate professional practice standard mandated further action in an effort to protect Mr. Garrett's endotracheal tube. Furthermore, all of the experts' opinions are premised upon the incorrect fact that the plaintiff was in an agitated state following surgery. Accordingly, we affirm the trial court and tax the costs of this appeal to the plaintiff Freda G. Moon.

_____
SAMUEL L. LEWIS, JUDGE

CONCUR:

_____
HENRY F. TODD, P.J., M.S.

_____
WILLIAM C. KOCH, JR., JUDGE