IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
July 19, 2011 Session

## MARSHA McDONALD
v.
## PAUL F. SHEA M.D. AND SHEA EAR CLINIC

**Appeal from the Shelby County Circuit Court**
**No. CT-003393-05    John R. McCarroll, Jr., Judge**

**No. W2010-02317-COA-R3-CV - Filed February 16, 2012**

This is a medical malpractice appeal.  The plaintiff patient was treated by the defendant physician for ear problems.  After the treatment, she had a complete loss of hearing in one ear.  The plaintiff patient filed this lawsuit against the physician, alleging medical malpractice and lack of informed consent.  After potential experts in Tennessee and contiguous states declined to testify against the defendant physician, the trial court permitted the plaintiff to use an expert physician witness from a non-contiguous state.  At the jury trial, after the jury was sworn and counsel gave opening statements, a juror notified the trial judge of the her concern about an upcoming social event she planned to attend, at which a relative of the defendant physician would be present.  After *voir dire*, the trial judge noted that the plaintiff patient had unused remaining peremptory challenges and excused the juror.  The trial court denied the defendant physician's motion for directed verdict on informed consent. The jury awarded the plaintiff substantial compensatory damages. The defendant physician now appeals, arguing that the trial court erred in permitting the plaintiff to obtain an expert from a non-contiguous state, in allowing the plaintiff to exercise a peremptory challenge after trial was underway, in permitting the informed consent claim to go to the jury, and in denying the defendants' motion to exclude the expert retained by the plaintiff.  We affirm on all issues except the dismissal of the juror.  We hold it would be error to permit the exercise of a peremptory challenge after the trial is underway, but find that any error was harmless under the facts of this case.  Therefore, we affirm.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which J. STEVEN STAFFORD, J., joined; and ALAN E. HIGHERS, P.J., W.S., concurred in part and dissented in part.

Albert C. Harvey, John H. Dotson, and Justin N. Joy, Memphis, Tennessee, for Defendants/Appellants Paul F. Shea, M.D. and Shea Ear Clinic.

Gary K. Smith and Janelle C. Clark, Memphis, Tennessee for Plaintiff/Appellee Marsha McDonald.

## OPINION

### FACTS AND PROCEEDINGS BELOW

In May 2000, Plaintiff/Appellee Marsha McDonald ("McDonald") consulted a physician at the Defendant/Appellant Shea Ear Clinic ("Shea Clinic") about problems with her ear. She was diagnosed with partial hearing loss in her left ear. A year later, McDonald visited the same physician, no longer associated with Shea Clinic, for follow up; it was determined that her hearing remained unchanged.

In the summer of 2004, McDonald began experiencing new symptoms, including pressure in her head and lightheadedness in the morning. On July 16, 2004, McDonald visited Defendant/Appellant Paul F. Shea, M.D. ("Dr. Shea") at the Shea Ear Clinic concerning the new symptoms she was experiencing. After McDonald underwent several tests, Dr. Shea informed her that she was suffering from Ménière's disease in her left ear, which was causing the hearing loss in that ear.[1] Dr. Shea recommended a course of treatment that included perfusion, that is, making a small hole in the ear drum and injecting medication into the middle ear space. Dr. Shea gave McDonald a pamphlet explaining the prefusion procedure and discussed with McDonald the expected outcome. The pamphlet stated, *inter alia*, that for 95% of patients who received perfusion treatment, the patient's hearing remained the same or improved, and for 5% of the patients, the patient's hearing was "worse" after treatment. According to McDonald, in the course of discussing the pamphlet and the risks with her, Dr. Shea told McDonald that perfusion "can even improve your hearing, but let's just count on your hearing staying the same." McDonald said that Dr. Shea did not advise her that she could experience total hearing loss as a result of the procedure.[2] McDonald agreed to the perfusion treatment recommended by Dr. Shea.

---

[1] Ménière's Disease is a condition of unknown cause affecting the inner ear, resulting in a progressive diminution of the balance and hearing functions of the inner ear.

[2] Dr. Shea's account of the conversation with McDonald differed somewhat from McDonald's recollection, but he agreed that he told her that he "would expect her hearing to stay the same."

On July 20, 2004, McDonald presented at the Shea Clinic to begin the three-day perfusion treatment. Upon arrival, she was given a document which indicated the risks of the procedure and stated that the perfusion treatment could result in "further increase in hearing loss, even to complete loss of hearing." McDonald had not brought her eyeglasses with her and told the Shea Clinic representative that she could not read the form. According to McDonald, she was told that everyone needed to sign the form acknowledging receipt of the risk disclosure document in order to receive the treatment; however, the information was not read or explained to her. McDonald signed the document and began the course of treatment that day. Over the next three days, Dr. Shea administered three rounds of perfusion therapy on McDonald.

After completing the perfusion therapy, McDonald began to experience a number of symptoms, including extreme dizziness, feeling off-balance, and a "stopped up" feeling in her left ear. As a result, McDonald visited several ear physicians, but did not initially return to see Dr. Shea. In November 2004, McDonald's hearing was tested and the results showed a 100% hearing loss in her left ear. This result was confirmed when McDonald later visited Dr. Shea.

On June 23, 2005, McDonald filed the instant lawsuit against Dr. Shea and the Shea Clinic in the Circuit Court of Shelby County, alleging, *inter alia*, negligent deviation from the applicable standard of care and failure to obtain informed consent. The complaint sought compensatory damages.[3] The defendants denied liability, and discovery ensued.

In the course of trial preparation, McDonald filed a motion for permission from the trial court to identify a medical expert witness from a state not contiguous to Tennessee, pursuant to Tennessee Code Annotated § 29-26-115(b).[4] The motion asserted that McDonald's counsel

---

[3]McDonald's complaint also alleged reckless conduct and sought an award of punitive damages. The claim for punitive damages was dismissed in advance of trial and is not at issue in this appeal.

[4]This statute provides:

> No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts required to be established by subsection (a), unless the person was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make the person's expert testimony relevant to the issues in the case and had practiced this profession or specialty in one (1) of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection (b) when it determines that the appropriate

(continued...)

had discussed her case with more than a dozen physicians from either Tennessee or a contiguous state,[5] and while "many"opined that the facts presented by counsel indicated "a strong case of malpractice" by Dr. Shea, each of the potential expert physicians indicated "that they were unwilling to give testimony in the case for fear of retribution" from Dr. Shea's father, a prominent Memphis physician specializing in ear problems. McDonald's motion stated that the potential expert witnesses stated that Dr. Shea's father "was known to be professionally vindictive." An affidavit by McDonald's counsel to that effect was filed in support of the motion. After a hearing, the trial court entered an order granting McDonald's motion.

Court permission in hand, McDonald identified an expert witness physician from Los Angeles, California, Dennis R. Maceri, M.D. ("Dr. Maceri"). After taking Dr. Maceri's deposition, Dr. Shea filed a motion to exclude his testimony from the trial. The bases for the motion to exclude included the following: (1) Dr. Maceri was unfamiliar with the standard of acceptable professional practice in Memphis, Tennessee; (2) Dr. Maceri's compared community, Los Angeles, California, is not similar to Memphis, Tennessee; and (3) Dr. Maceri's specialties and areas of practice did not qualify him to opine on the standard of acceptable practice for the treatment at issue. The trial court declined to grant Dr. Shea's motion to exclude, and Dr. Maceri was permitted to testify on behalf of McDonald.

The jury trial in this matter commenced on June 14, 2010. The attorneys were permitted to conduct *voir dire*, which included a "catch-all" question by counsel for McDonald, asking potential jurors to disclose any reason why it would be "difficult" to be fair and impartial. McDonald was given six peremptory challenges and used four of them. The defendants Dr. Shea and Shea Clinic were given eight peremptory challenges and used all eight of them. At the end of the jury selection process on June 14, a total of twelve jurors and two alternates were selected and sworn, including Juror H. The alternates were not identified at that time.

The next morning, June 15, after the jury was empaneled and the lawyers gave their opening statements, the trial judge received a note from Juror H. The note stated that, during the coming weekend, Juror H expected to attend a social event hosted by her in-laws, and that Dr. Shea's mother was expected to attend the event. It said that, while Juror H did not know

---

[4](...continued)
        witnesses otherwise would not be available.

Tenn. Code Ann. § 29-26-115(b) (Supp. 2011).

[5]The original motion and supporting affidavit did not state that the physicians whom McDonald's counsel consulted practiced in either Tennessee or a contiguous state; this was later clarified by amending the supporting affidavit.

Dr. Shea or his family, Dr. Shea's mother was a friend of Juror H's mother-in-law. In light of the note, the attorneys were permitted to conduct additional *voir dire* on Juror H. Juror H explained that she wrote the note because the information was laying "heavy on [her] heart." She admitted that while she had never met Dr. Shea or his father, she had met Dr. Shea's mother two or three times in social settings. Juror H conceded that voting against Dr. Shea in the lawsuit would make her feel uncomfortable in future social situations, but said that she could put aside her discomfort "to do the right thing" in this lawsuit.

After Juror H left the courtroom, the trial court clarified with the lawyers that, after jury selection was completed, McDonald had two unused peremptory challenges. In response to the trial court's inquiry, counsel for McDonald indicated that, had he known the information disclosed by Juror H during jury selection, he would have used one of his unused peremptory challenges to remove her from the jury. The trial judge then stated to McDonald's attorney, "I think you have a right to do that now." After McDonald's counsel said, "I would do that," the trial court stated: "Okay. The next question is since I've ruled that way, . . ." and began discussing the number of jurors that remained. When counsel for Dr. Shea objected to the exercise of peremptory challenge after the trial "got started," the following exchange took place:

> The Court: Well, I think that what she did was absolutely the right thing to do. I think that based upon her statement to us that she would try to do the right thing but that she would be in a situation that would be hard for her, whatever her words were, is sufficient for a challenge.
>
> Mr. Harvey: I don't think she said it would be hard for her, your Honor. Well, in any event, I've made my statement.
>
> The Court: You think she ought to be retained. I understand that. And I've told you why I think she ought to be excused, and so I guess the next group to talk to about it is up in Jackson. . . .

After this, Juror H was excused. The trial then continued with one alternate juror; the alternate was not selected from the empaneled jury until the end of the trial.

In the ensuing trial, the jury heard testimony from, among others, McDonald and her expert witness, Dr. Maceri, as well as Dr. Shea and his expert witness. In his testimony, Dr. Maceri testified as to why Los Angeles, California is similar to Memphis, Tennessee for purposes of the applicable professional standard. After testifying about the appropriate standard of care, Dr. Maceri opined that Dr. Shea's treatment of McDonald fell below the standard of care in his misdiagnosis of her condition as Ménière's disease, in his selection of perfusion

therapy to treat her, in his selection of the medication administered to McDonald, and in describing the risks associated with perfusion therapy differently from the risk disclosure in the written consent form.

On cross-examination, Dr. Maceri was asked about his familiarity and experience with perfusion therapy. He testified that he was familiar with perfusion therapy but in his current practice he advises his patients about perfusion therapy and then refers the patient to a colleague to perform the therapy if it is indicated.

At the close of McDonald's proof, Dr. Shea moved for a directed verdict on McDonald's informed consent claim. The trial court deferred ruling on the motion until the close of all of the proof. After the defense put on its proof, the motion was renewed. The trial court denied the motion, and included lack of informed consent in the jury instructions and on the jury verdict form.

On June 14, 2010, the jury returned a general verdict in favor of McDonald. She was awarded compensatory damages in the amount of $500,000. The defendants now appeal.

## ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, defendants Dr. Shea and Shea Clinic (hereinafter collectively "Shea") argue that the trial court erred in declining to direct a verdict on McDonald's claim of lack of informed consent.

Shea raises numerous issues with respect to Dr. Maceri. Shea asserts that the trial court erred in waiving the statutory requirement that the medical expert practice in Tennessee or a contiguous state. Shea also insists that Dr. Maceri should have been excluded from testifying because (1) he failed to demonstrate that he had first-hand knowledge of the applicable standard of care in the Memphis community; (2) he failed to demonstrate that the compared community, Los Angeles, is similar to the Memphis community; (3) he based his opinion on a national standard of care instead of the approved local standard; and (4) he lacked the requisite knowledge of the protocol of transtympanic perfusion treatments, the diagnostic test used by Dr. Shea to diagnose Ménière's, and the use of streptomycin to treat McDonald's condition.

Finally, Shea argues that the trial court erred by allowing McDonald's counsel to discharge Juror H by exercising a peremptory challenge after the jury had been selected and sworn.

With respect to Shea's motion for directed verdict on informed consent, the trial court's decision on a motion for directed verdict is reviewed *de novo* on appeal. ***Brown v. Crown***

-6-

*Equipt. Corp.*, 181 S.W.3d 268, 281 (Tenn. 2005). The appellate court uses the same standard as the trial court in making the determination on the motion for directed verdict. *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003). In considering a motion for direct verdict, a court must "take the strongest legitimate view of the evidence in favor of the non-moving party, construing all evidence in that party's favor and disregarding all countervailing evidence." *Id.* A motion for directed verdict should be granted "only if reasonable minds could reach only one conclusion from the evidence." *Id.*

The trial court's determinations regarding the testimony of McDonald's expert witness are reviewed under an abuse of discretion standard, because determinations regarding the admissibility, qualifications, relevancy and competency of expert testimony are generally left to the discretion of the trial judge. *McDaniel v. CSX Transp., Inc.,* 955 S.W.2d 257, 263-64 (Tenn. 1997). The trial court's decision regarding the waiver of the contiguous state rule and the determination of similar communities set forth in Tennessee Code Annotated § 29-26-115 is reviewed for an abuse of discretion. *Wilson v. Patterson,* 73 S.W.3d 95, 102 (Tenn. Ct. App. 2001); *Steele v. Ft. Sanders Anesthesia Group, P.C.*, 897 S.W.2d 270, 281 (Tenn. Ct. App. 1994). Overall, a trial court's determination of whether to admit or exclude evidence is reviewed under an abuse of discretion standard. *Biscan v. Brown*, 160 S.W.3d 462, 468 (Tenn. 2005).

The standard of review for the trial court's actions in excusing Juror H is abuse of discretion. *See State v. Howell,* 868 S.W.2d 238, 248 (Tenn. 1993) (stating that "the right to peremptory challenges is not of a constitutional dimension"); *Lindsey v. State*, 225 S.W.2d 533, 538 (Tenn. 194938) ("The judges of the various [courts] are of necessity given wide discretion in determining the qualifications of jurors and their discretion is not subject to review 'except in cases where it is clearly made to appear it has been abused.' ") (quoting *Thomas v. State*, 75 S.W.1025, 1026 (Tenn. 1903)).

Generally speaking, a trial court abuses its discretion when it causes an injustice to the party challenging the decision by applying an incorrect legal standard, or reaching an illogical or unreasonable decision. *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010). As stated in *Lee Med*, "[a]n abuse of discretion occurs when a court strays beyond the applicable legal standards or when it fails to properly consider the factors customarily used to guide the particular discretionary decision." *Id.*

**ANALYSIS**

**Informed Consent**

We consider first Shea's argument that the trial court erred in declining to direct a verdict on McDonald's claim based on lack of informed consent. Shea argues that McDonald received a full disclosure of the risks associated with perfusion treatment, through the Shea Clinic pamphlet, Dr. Shea's conversation with McDonald, and the consent form McDonald signed immediately before the perfusion procedure was performed. Shea insists that the information provided to McDonald comported with the applicable standard of acceptable professional practice, and the motion for directed verdict on this claim should have been granted.

As noted above in the Standard of Review, in reviewing the trial court's denial of Shea's motion for a directed verdict on the issue of informed consent, this Court must construe all evidence in the light most favorable to McDonald, disregard all countervailing evidence, and determine whether reasonable minds could reach only one conclusion from the evidence. *Gaston v. Tenn. Farmers Mut. Ins. Co.*, 120 S.W.3d 815, 819 (Tenn. 2003). In so doing, we apply the standard for sufficiency of the evidence that would be applied at trial. Robert Banks, Jr. & June F. Entman, *Tennessee Civil Procedure* § 10-9(c) (3d ed. 2009). A patient asserting a medical malpractice claim based on lack of informed consent must prove "(1) what a reasonable medical practitioner in the same or similar community would have disclosed to the patient about the risk posed by the proposed procedure or treatment; and (2) that the defendant departed from the norm." *Ashe v. Radiation Oncology Assocs.*, 9 S.W.3d 119, 121 (Tenn. 1999); *see also Church v. Perales*, 39 S.W.3d 149, 159-60 (Tenn. Ct. App. 2000). The inquiry in lack of informed consent cases is whether the physician provided the patient sufficient information to enable the patient to make an intelligent and informed decision either to refuse or consent to the procedure. *See Shadrick v. Coker*, 963 S.W.2d 726, 732 (Tenn. 1998); *Church*, 39 S.W.3d at 159.

In the case at bar, the pamphlet given to McDonald prior to the procedure stated that, out of more than 500 persons who had undergone the perfusion procedure at Shea Clinic, in 5% of those cases, the patient's hearing was "worse." The pamphlet also included a disclaimer: "With all three operations [perfusion procedures], no guarantees are made that the patient will not continue to have dizzy spells, or be unsteady, or have further or *complete hearing loss*, or worse fullness and tinnitus." (emphasis added.) The consent form McDonald signed immediately before undergoing the procedure stated that the procedure could result in "[f]urther increase in hearing loss, even to complete loss of hearing."[6]

---

[6]McDonald testified that she did not bring her glasses with her to Shea Clinic when she presented for the
(continued...)

However, in her discussion with Dr. Shea, McDonald testified she specifically asked him about the statement in the Shea Clinic pamphlet to the effect that her hearing could get worse after the procedure. McDonald testified that Dr. Shea skipped over her concerns and told her, "let's just count on your hearing staying the same." McDonald was adamant that Dr. Shea never told her that it was possible for her to lose her hearing altogether.

McDonald's expert witness, Dr. Maceri, testified that he found no fault with either the contents of the Shea Clinic pamphlet or the pre-procedure consent form, and that he has utilized similar forms in his own practice in the past. However, he testified that his patient's understanding is better when he has a conversation with the patient about the risks; he said that he verbally went "through all the salient points" in the written materials. Dr. Maceri also testified that the standard of care mandated consistency between the physicians' verbal remarks and the written materials, that the physician should not tell the patient one thing and ask them to sign another. Dr. Maceri opined that "the risks of perfusion and some of the potential consequences . . . were not sufficiently laid out [by Dr. Shea] for [McDonald] to make an intelligent decision about whether or not this was something that she wanted to go through," and thus that Dr. Shea's disclosures to McDonald fell below the standard of acceptable professional practice.

On appeal, Shea argues that the risk of total loss of hearing was disclosed in the written materials Shea Clinic provided to McDonald, and that this was sufficient to meet the applicable standard of acceptable professional practice. However, McDonald's expert testimony provided evidence that the applicable standard required the physician to go over these same risks in his verbal discussions with the patient as well. According to McDonald's testimony, Dr. Shea did not tell McDonald that she could suffer a total loss of hearing, and in fact made remarks to her that a trier of fact could construe as reassurance that he expected her hearing to be no worse after the perfusion treatment. Under these circumstances, we find that Shea did not meet the burden of proving that reasonable minds could reach only one conclusion, favoring Shea. *Gaston*, 120 S.W.3d at 819. Therefore, we find no error in the trial court's denial of Shea's motion for directed verdict on informed consent.

## Expert Witness

We consider next Shea's argument that the trial court erred in permitting the testimony of McDonald's expert, Dr. Maceri, for a number of reasons. First, Shea contends that the trial court erred in waiving the contiguous state requirement. Shea also raises a number of issues

<hr>

[6](...continued)
procedure, and so could not read the form, and it was not read to her.

regarding Dr. Maceri's competence to testify about the applicable standard of care. We address these issues in turn.

### Waiver of Contiguous State Rule

Expert testimony in a medical malpractice action is governed by Tennessee Code Annotated § 29-26-115. Under this statute, in order to be competent to provide expert testimony, the witness must have been licensed to practice in Tennessee or in a contiguous bordering state during the year preceding the date of the alleged injury. Tenn. Code Ann. § 29-26-115(b) (Supp. 2011). Under the same statute, the trial court may waive this requirement "when it determines that the appropriate witnesses otherwise would not be available." *Id.*

In the matter before us, McDonald's counsel submitted an affidavit detailing his lengthy search for a properly qualified expert. The expert who initially agreed to testify for McDonald developed health problems that required him to decline to testify. After that, McDonald's counsel spoke to "in excess of a dozen" potential experts either in Tennessee or a contiguous state.[7] In each instance, McDonald's counsel stated, "those physicians stated to me that [McDonald] has a meritorious case. In other words, everyone found that malpractice occurred. However, in each case those physicians declined to be identified as a testifying expert for fear of professional retaliation that they would expect from the Defendant, Dr. Shea's, father." Based on the statements of counsel and the entire record, the trial court granted McDonald's motion for permission to identify an expert from a noncontiguous state.

On appeal, Shea argues that there was no showing that no appropriate witness from Tennessee or a contiguous state was "available," that the affidavit of McDonald's counsel shows only that no physician was *willing* to testify on McDonald's behalf. Shea likens this to a situation in which no expert in Tennessee or a contiguous state is willing to testify because no malpractice occurred.

In response, McDonald argues that no Tennessee case has made a distinction between qualified experts who are "unavailable" versus "unwilling" to testify, and that the real inquiry is whether a qualified expert from Tennessee or a contiguous state can be located. Tenn. Code Ann. § 29-26-115(b). Both parties rely on *Rose v. H.C.A. Health Servs. of Tenn.*, 947 S.W.2d 144 (Tenn. Ct. App. 1996) in support of their positions.

---

[7]The original affidavit did not specify that the potential experts practiced in Tennessee or a contiguous state. This was clarified in an amended affidavit stating: "All said physicians were from Tennessee or a contiguous state."

Tennessee courts have considered the provision allowing waiver of the contiguous state requirement to be a "safety valve" for situations "in which a party is unable to locate a qualified expert within [Tennessee] or one of our bordering states." *See Sutphin v. Platt*, 720 S.W.2d 455, 458 (Tenn. 1986). The trial court's decision to waive this requirement is generally upheld if it falls "within the range of acceptable alternatives." *Ward v. Glover*, 206 S.W.3d 17, 38 (Tenn. Ct. App. 2006); *Steele v. Ft. Sanders Anesthesia Grp.*, 897 S.W.2d 270, 280-81 (Tenn. Ct. App. 1994) (finding no abuse of discretion in granting waiver based on affidavits demonstrating reasonable diligence). In *Rose v. H.C.A. Health Servs.*, the plaintiffs searched unsuccessfully in Tennessee and bordering states for an expert in hospital risk management and quality assurance. *Rose*, 947 S.W.2d at 147-48. Plaintiffs' counsel submitted an affidavit stating that health care professionals in these areas would talk to him only if they were not identified. *Id.* at 147. The affidavit expressed counsel's belief that the size of defendant H.C.A. would make it difficult to find a witness in Tennessee or a contiguous state. *Id.* The plaintiffs asked the trial court to waive the contiguous state requirement, and this request was denied. *Id.* at 148. The plaintiffs appealed. The appellate court found no abuse of the trial court's discretion, holding that the difficulties described by plaintiffs' counsel in that case were "generalized and unspecific," and reflected "only a cursory effort to find an appropriate expert." *Rose*, 947 S.W.2d at 148. Additionally, the plaintiffs' counsel cited only a conversation with a single hospital administration in support of his assertion that the large size of the defendant corporation would make it difficult to find an expert without a conflict of interest. *Rose*, 947 S.W.2d at 147-48.

Shea argues that the affidavits of plaintiffs' counsel in *Rose* "demonstrate a greater effort to locate an expert than" the affidavit of McDonald's counsel in this case. Shea also contends that the appellate court in *Rose* did not find persuasive the argument that the size of the corporate defendant made it difficult to find an expert, and asserts: "If the affidavits were insufficient in the *Rose* case, [McDonald's] counsel's affidavit in the present case is likewise insufficient."

We find that *Rose* does not support Shea's position on appeal. First, the appellate court in *Rose* did not reach the issue of whether the reason proffered by plaintiffs' counsel, that the size of the corporate defendant made it difficult to find an expert free of a conflict of interest, could constitute unavailability under Section 29-26-115(b). Second, in *Rose*, the trial court determined, in its discretion, *not* to waive the contiguous state requirement. This case presents the converse of the situation in *Rose*. Here, we examine whether the trial court abused its discretion in *granting* a waiver of the contiguous state requirement. *See In re Estate of Hess*, W2002-02166-COA-R3-CV, 2004 WL 370300, at *6 (Tenn. Ct. App. Feb. 27, 2004). Therefore, *Rose* tells us only that the trial court's *denial* of a waiver was within the range of acceptable alternatives in that case; it does not tell us whether the *grant* of a waiver is also within the range of acceptable alternatives.

We find that the reason McDonald's prospective experts in Tennessee and contiguous states give for not testifying on McDonald's behalf is not *per se* insufficient to support a finding that no appropriate witness from Tennessee or a contiguous state is "available." Considering the affidavits by McDonald's counsel and the record as a whole, we find that the trial court's decision was "within the range of acceptable alternatives" and that there was no abuse of discretion in the trial court's grant of McDonald's motion for permission to identify a medical expert witness from a state not contiguous to Tennessee.

### *Competence of Expert*

In a medical malpractice case, the claimant's expert proof must meet the requirements of Tennessee Code Annotated § 29-26-115(a). Under this subsection of the statute, the plaintiff has the burden of proving, by competent expert testimony, "[t]he recognized standard of acceptable professional practice in the profession and the speciality thereof, if any, that the defendant practices in the community in which the defendant practices or in a similar community" at the time the claimant's injury occurred. Tenn. Code Ann. 29-26-115(a)(1) (Supp. 2011).

Shea argues that Dr. Maceri was not competent to offer the required expert testimony for several reasons. The first reason arises out of the "locality rule" set forth in Section 29-26-115(a). Specifically, Shea contends that Dr. Maceri was not competent to testify about the standard of care in Memphis, Shelby County, Tennessee, or in a similar community. Shea notes that Dr. Maceri did not have first-hand, personal knowledge of the standard in Memphis and Shelby County, as required under caselaw, and that the community in which Dr. Maceri practices, Los Angeles, California, is not "similar" to the Memphis and Shelby County community. Shea also contends that Dr. Maceri's opinions were based on a national standard of care, rather than the standard of care in Memphis or even in Los Angeles. For these reasons, Shea asserts that it was error for the trial court to permit Dr. Maceri's testimony.

These issues were addressed at some length by our Supreme Court in a decision issued after oral argument in this appeal, ***Shipley v. Williams***, 350 S.W.3d 527 (Tenn. 2011). In ***Shipley***, the plaintiff filed a medical malpractice lawsuit against her surgeon arising out of abdominal surgery. ***Shipley***, 350 S.W.3d at 532. The trial court granted the defendant surgeon's motion to exclude the testimony of the plaintiff's expert, finding *inter alia* that the expert was not competent to testify about the standard of care in Nashville, when the alleged malpractice occurred, and that the community in which the expert practiced medicine, in North Carolina, was not similar to Nashville as required by Tennessee Code Annotated § 29-26-115(a). ***Id.*** at 535. On that basis, the trial court granted summary judgment in favor of the defendant

surgeon, and the plaintiff appealed. After the intermediate appellate court affirmed the grant of summary judgment, the plaintiff appealed to the Supreme Court.

On appeal, the *Shipley* Court chose to examine the locality rule in detail, reviewing caselaw issued by the Supreme Court and the intermediate appellate court, shaping and interpreting the locality rule. After doing so, the Court emphasized that, in determining whether an expert witness will be permitted to testify at trial,

> . . . the trial court is not to decide how much weight is to be given to the witness' testimony. Once the minimum requirements are met, any questions the trial court may have about the *extent* of the witness's knowledge, skill, experience, training, or education pertain only to the weight of the testimony, not to its admissibility.

*Id.* at 551 (emphasis in original). The Court then noted that the term "similar community" is not defined, and Section 29-26-115(a) does not require a particular means or manner of proving what constitutes a "similar community." *Id.* at 552. The *Shipley* Court reaffirmed its adherence "to the requirement that a medical expert must demonstrate a modicum of familiarity with the medical community in which the defendant practices or a similar community." *Id.* It explained:

> Generally, an expert's testimony that he or she has reviewed and is familiar with pertinent statistical information such as community size, hospital size, the number and type of medical facilities in the community, and medical services or specialized practices available in the area; has discussed with other medical providers in the pertinent community or a neighboring one regarding the applicable standard of care relevant to the issues presented; or has visited the community or hospital where the defendant practices, will be sufficient to establish the expert's testimony as relevant and probative to "substantially assist the trier of fact to understand the evidence or to determine a fact in issue" under Tennessee Rule of Evidence 702 in a medical malpractice case and to demonstrate that the facts on which the proffered expert relies are trustworthy pursuant to Tennessee Rule of Evidence 703.

*Id.* at 552 (citations omitted). The *Shipley* Court then flatly rejected the requirement that the medical expert have "personal, firsthand, direct knowledge" of a medical community and the standard of medical care in that community in order to be deemed competent to testify, as set forth in *Allen v. Methodist Healthcare Memphis Hosps.*, 237 S.W.3d 293, 297 (Tenn. Ct. App. 2007), and *Eckler v. Allen*, 231 S.W.3d 379, 387 (Tenn. Ct. App. 2006). The Court explained:

A proffered medical expert is not required to demonstrate "firsthand" and "direct" knowledge of a medical community and the appropriate standard of medical care there in order to qualify as competent to testify in a medical malpractice case. A proffered expert may educate himself or herself on the characteristics of a medical community in order to provide competent testimony in a variety of ways, including but not limited to reading reference materials on pertinent statistical information such as community and/or hospital size and the number and type of medical facilities in the area, conversing with other medical providers in the pertinent community or a neighboring or similar one, visiting the community or hospital where the defendant practices, or other means.

*Shipley*, 350 S.W.3d at 552-53.

*Shipley* also addressed instances in which a medical expert indicates that the applicable standard of care in a malpractice case is a national standard of care:

> [W]e recognize in many instances the national standard [of care] is representative of the local standard . . . .
> . . . [E]xpert medical testimony regarding a broader regional standard or a national standard should not be barred, but should be considered as an element of the expert witness' knowledge of the standard of care in the same or similar community . . . . [This] is simply a common sense recognition of the current modern state of medical training, certification, communication, and information sharing technology . . . .

*Id.* at 553 (citations omitted). The Court explained how an expert may incorporate a national standard of care into his opinion testimony:

> Only after a medical expert witness has sufficiently established his or her familiarity with the standard of care in the same or similar community as the defendant, may the witness testify that there is a national standard of medical care to which members of his or her profession and/or specialty must adhere. This testimony, coupled with the expert's explanation of why the national standard applies under the circumstances, is permissible and pertinent to support the expert's opinion on the standard of care. The mere mention of a national standard of care should not disqualify an expert from testifying. However, an expert may not rely solely on a bare assertion of the existence of an applicable national standard of care in order for his or her proffered testimony to be admissible under Rules of Evidence 702 and 703.

-14-

*Id.* at 553-54.

We must evaluate the issues raised by Shea, and the appellate record, in light of ***Shipley***. In this case, Dr. Maceri submitted a sworn affidavit, testified in a deposition, and also testified at trial. In his affidavit, Dr. Maceri states:

> I am familiar with and know the recognized standard of acceptable medical practice for physicians and nurses engaged in the practice of medicine, including otolaryngology, in the medical community of Memphis, Shelby County, Tennessee and similar communities. The medical community in which I practice, Los Angeles, California, though larger, is similar to the medical community of Memphis, Tennessee. Each community is home to large academic facilities, multiple large hospitals and various medical specialties. I am specifically familiar with the recognized standard of acceptable professional practice applicable to Paul F. Shea, M.D. in diagnosing and treating a patient such as Ms. McDonald at the time of her treatment in Shelby County, Tennessee as well as in the community where I practice, which is similar to Memphis. Further, the parameters for doctors and treatment of a patient such as Ms. McDonald are the same everywhere and certainly so for a clinic such as the Shea Clinic that holds itself out as one of the leading hearing treatment centers in the country.

In his deposition, Dr. Maceri described his ongoing contacts with a former colleague, McDonald's treating physician in her first visit to Shea Clinic:

> Q: How are you familiar with the practice of otology in Memphis, Tennessee?
> A: Well, I have one former resident who is in practice in Memphis, Tennessee.
> Q: Who would that be?
> A: That's Dr. Fetterman. And I speak with him from time to time and what the other information was was [sic] what I gleaned from the information that was provided me about the demographics of the area.
> . . .
> Q: When is the last time you've spoken with Dr. Fetterman?
> A: I spoke with Dr. Fetterman about a month ago.
> Q: And did you talk to him about this case?
> A: Not about this case, no, sir.
> Q: Why not?
> A: I asked him specifically two questions and – because I just wasn't absolutely certain what the remaining portion of the community was doing and I asked him, No. 1, was the drug of choice for perfusion of patients that needed

-15-

a chemical labyrinthectomy was it Gentamicin or Streptomycin and he told me that it was his understanding that it was Gentamicin except for at the Shea Clinic. And the other question I asked him was whether or not there were vestibular rehabilitative facilities available in the Memphis area. I saw in the packet that Mr. Smith had provided me that there was a rehab center at the Baptist Hospital and Dr. Fetterman confirmed that there was, indeed, vestibular rehab facilities and that he uses them.

Dr. Maceri testified in his deposition that the standard of care applicable in Memphis is in essence a national standard of care:

Q: Do you – do you believe that you know the standard of care for physicians practicing otology in the Memphis area?
A: I do.
Q: And how do you believe you know that?
A: Well, standard of care for our field is pretty much uniform in the sense that our societies, our journals, both from the Academy and from the Triologic Society, put out articles like the ones that we looked at earlier that list treatments, results from research, et cetera, so that physicians who practice in that field it's incumbent upon them to read the journals and to learn the new techniques and be aware of new changes and new styles and new techniques used and different things.
Q: So are you saying that there's a national standard of care?
A: I am.
Q: Do you believe that?
A: Yes, sir, I do.
Q: And do you believe that all physicians should be adhering to this national standard of care?
A: I think that the standards that are put out by our Academy, by our subspecialty societies are the things that dictate how medicine is practiced throughout this country and it's done so deliberately so that you have some continuity of the way things are done and that things are done relatively similar in different locations.

Dr. Maceri elaborated on this in his trial testimony. After acknowledging that his practice is in Los Angeles and all of his training was acquired in Los Angeles and Michigan, Dr. Maceri testified:

Q: Your knowledge of Memphis, I assume, has come from reading some things about our population since this case started?

A: Yes.

Q: For example, we do know, don't we, Doctor, that Los Angeles is about six times as big as Memphis?

A: Yes.

Q: Has six times as many hospitals?

A: Correct.

Q: You do know the – oh, and incidentally, you've never practiced here?

A: No, sir.

Q: Never practiced with any physicians here?

A: The only physician that I know in this area is Bruce Fetterman. He was one of my residents at USC.

Q: And you haven't seen him for years?

A: No.

Q: Is that correct?

A: That's correct.

Q: You know about the Shea Clinic?

A: Yes, sir.

Q: You've read medical articles written by Dr. John Shea?

A: I have.

Q: You know that it is a significant treating facility in the area?

A: Yes, sir.

Q: Your position, I believe, Doctor, is that the standard of care is a national standard of care, applies everywhere?

A: I think that there are components of it that are national. Yes.

Q: All physicians are bound by that national standard of care, is that your position?

A: That is.

Q: You don't recognize a regional difference, or a local difference in the way physicians practice medicine?

A: Oh, yes. I think there are variations. But the standards both from an intellectual standpoint, what you've read and what you've learned as a trainee, or a physician, are measured and tested on a national basis. There are individual idiosyncrasies that people will develop as they are in practice. But the core, the basic fundamental principles are the same whether you're in Memphis, Ann Arbor, or Los Angeles.

Q: And all of these principles you've testified [to] today, you think those are national principles?

A: I do.

Q: Do you know about individual practices in the Memphis area that differ from the national practice?

A: The only awareness of difference that I was aware of, and I obtained that information from Dr. Fetterman, was that most of the people in this area, when they do perfusion, use Gentamicin, except for the people at the Shea Clinic.
Q: The Shea Clinic is the largest facility in this region; correct?
A: Yes.

Thus, in the trial court below, Dr. Maceri took the position that (1) Los Angeles, where he practiced, is similar to Memphis in the context of this case; (2) despite having no first-hand experience practicing in Memphis, he had familiarized himself with the standard of care in Memphis; and (3) the standard of care in Los Angeles and Memphis, applicable to Dr. Shea, is in fact a national standard as to the procedures at issue in this case.

We look first at whether the trial court erred in finding that Los Angeles is similar to Memphis under Section 29-26-115(a) in the context of this case. In a supplemental affidavit, Dr. Maceri outlined the basis for his assertion that the two communities are similar. After reciting specific figures on the population of Memphis and the number of hospitals and hospital beds in Shelby County, Dr. Maceri explained:

Since I was not asked to do so during my deposition, I am providing such a comparison now. The Los Angeles and Memphis medical communities, though somewhat different in scale because of the difference in population, are nevertheless similar communities. They are both homes to university-based medical centers and university-based medical training programs. They both have community and specialty hospitals. They both offer a large number of medical specialties, including otology. Adjusting for the difference in population, Memphis and Los Angeles also have a comparable number of health care facilities and beds. In summary, there is really no appreciable difference in the medical communities of Memphis and Los Angeles. At a minimum, they are similar communities. The medical and physiological considerations involved in the determination of whether to use transtympanic perfusion therapy on a patient, and whether to use Gentamycin or Streptomycin as the medication of choice in such a procedure, are not influenced any geographic differences between the Memphis and Shelby County, Tennessee community or the Los Angeles, California community. Physicians practicing otology in both of these communities have access to the same medical information concerning transtympanic perfusion therapy and whether to use Gentamycin or Streptomycin as the medication of choice in such a procedure. Further, the diagnosis of Ménière's does not change from community to community. The diagnostic criteria are well understood within the specialties and do not change based on geographic location. All of this is true no matter

-18-

the specialty nor [sic] location, but it is particularly true in sophisticated medical communities such as Los Angeles and Memphis. For consideration of all the issues that pertain to this case, it is my personal and medical belief that Los Angeles and Memphis are similar medical communities. This is not a situation where a community is impaired in its ability to deliver services because of lack of financial commitment, resources, information, or ability to provide services. In every way a patient presenting such as Marsha McDonald did to the Shea Clinic in July of 2004, should be subject to the same standards of care whether in Los Angeles, Memphis, or many other similar communities. Having pointed out the many similarities between the Los Angeles and Memphis medical communities, I can think of absolutely no differences between them for the purposes of this case other than the proportionally commensurate larger number of doctors and nurses in Los Angeles.

As noted above, this is the type of information described in *Shipley* as appropriate for an expert to establish the similarity of a compared community to the defendant physician's community. *See Shipley*, 350 S.W.3d at 552.

Shea urges, however, that even if Dr. Maceri recites all of the right statistical information and makes an assertion that the two communities are similar, Los Angeles is in fact so dissimilar from Memphis that the trial court erred in permitting Dr. Maceri to testify.

We recognize that Los Angeles and Memphis are dissimilar in many respects, particularly in the terms of sheer population size. However, the purpose of the determination of whether a compared community is "similar" is to ensure that the defendant medical professional's conduct, and whether malpractice occurred, is evaluated in light of a standard of care that is fair and appropriate. Thus, the term "similar community" is not an absolute, but instead must be viewed in the context of the medical procedures at issue. In his affidavit, Dr. Maceri gives a cogent explanation of the reasons for his assertion that the compared communities are similar in ways that are pertinent to the issues in this case. In contrast, Shea's argument on appeal appears to be that, given the difference in population size, Los Angeles *cannot* be deemed similar to Memphis for that reason alone. We must reject this argument.

Our analysis is also informed by the discussion in *Shipley* regarding a national standard of care, "recogniz[ing] that in many instances the national standard is representative of the local standard." *Shipley*, 350 S.W.3d at 553. Dr. Maceri's position, in essence, is that the Memphis medical community is of sufficient size and level of sophistication that the standard generally applied in an urban medical community such as Los Angeles is applicable in Memphis, and specifically to Dr. Shea and Shea Clinic.

We are also cognizant of the emphasis in *Shipley* on the trial court's role as gatekeeper, stressing that the trial court is to decide only whether the proffered expert meets the minimum competency requirements, with the expectation that the expert "will thereafter be tested with the crucible of vigorous cross-examination . . . ." *Shipley*, 350 S.W.3d at 551 (quoting *McDaniel v. CXS Transp., Inc.*, 955 S.W.2d 257, 265 (Tenn. 1997)).

Overall, considering the record as a whole, we cannot conclude that the trial court abused its discretion in declining to exclude Dr. Maceri's testimony on the basis that Los Angeles and Memphis are not similar communities.

In addition, we find that Dr. Maceri's testimony about a national standard in this case is well in line with the parameters set forth in *Shipley*. Dr. Maceri did not rely on a "bare assertion of the existence of an applicable national standard of care," but instead explained "why the national standard applies under the circumstances. . . ." *Shipley*, 350 S.W.3d at 553. Therefore, under *Shipley*, Dr. Maceri's discussion of a national standard did not disqualify him from testifying, but was "permissible and pertinent" to support his opinion on the standard of care. *Id.*

In the trial court below, Dr. Maceri appeared to take the position that, although he admittedly had no first-hand knowledge of the standard of care in Memphis and Shelby County, he had reviewed statistical information and discussed the standard with at least one practitioner in Memphis, such that he had "become qualified" to opine on the standard of care in Memphis. Under *Shipley*, this appears to be permissible. *Id*. at 552. However, we have already found no abuse of discretion in the trial court's conclusion that Los Angeles and Memphis are similar communities for purposes of this case, and that Dr. Maceri's discussion of a national standard does not disqualify him. Under Section § 29-26-115, an expert need only testify as to the standard of care in "the community in which the defendant practices *or* in a similar community." Tenn. Code Ann. § 29-26-115(a)(1) (Supp. 2011) (emphasis added). Thus, we need not address whether Dr. Maceri had in fact "become qualified" to testify on the standard of care in Memphis, and hold that the trial court did not abuse its discretion in declining to exclude Dr. Maceri's expert testimony.

### *Requisite Knowledge of Expert*

Finally, Shea argues that Dr. Maceri did not have the requisite knowledge to offer expert testimony concerning: (1) perfusion treatment and (2) the use of Streptomycin to treat McDonald's condition, and (3) the diagnosis of Ménière's disease. Shea relies on Dr. Maceri's testimony that he does not do perfusion procedures, and specifically has never done transtympanic perfusion, the type of perfusion treatment McDonald received. Shea argues that Dr. Maceri's claim that he had become knowledgeable about perfusion procedures by

-20-

attending medical education meetings and events, reading medical publications and by contact with medical colleagues is an insufficient basis to offer opinion testimony. Similarly, Shea argues that Dr. Maceri's knowledge of Streptomycin is insufficient, in light of his testimony that he does not use Streptomycin, has never researched it, and has never written about it. Finally, Shea argues that Dr. Maceri does not have the requisite knowledge on the Ménière's diagnosis because "[a]s part of a battery of diagnostic tests, Dr. Shea ordered an electrocochleogram to be performed on [McDonald]. Dr. Maceri testified that he does not use electrocochleograms." Shea contends that, under Rules 702[8] and 703[9] of the Tennessee Rules of Evidence, the trial court erred in its role as a gatekeeper in determining that Dr. Maceri's expert testimony was sufficiently reliable, that his testimony would assist the trier of fact in determining the facts at issue, and that the facts and data underlying Dr. Maceri's testimony was sufficiently trustworthy. In support, Shea cites *McDaniel v. CSX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997), in which Tennessee's Supreme Court set forth several nonexclusive factors that may be considered in determining the reliability and trustworthiness of scientific testimony. These are:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community;

---

[8]Rule 702 of the Tennessee Rules of Evidence provides that:

> [I]f scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702 (2011).

[9]Rule 703 of the Tennessee Rules of Evidence states:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect. The court shall disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Tenn. R. Evid. 703 (2011).

and (5) whether the expert's research in the field has been conducted independent of litigation.

*McDaniel*, 955 S.W.3d at 265.  Shea also cites cases decided after *McDaniel*, in which the Court identified other non-definitive factors that a trial court may consider in assessing the reliability of an expert's methodology, including the expert's qualifications for testifying on the subject at issue and the connection between the expert's knowledge and the basis for the expert's opinion. *See Brown v. Crown Equip. Corp.*, 181 S.W.3d 268, 274-75 (Tenn. 2005); *State v. Stevens*, 78 S.W.3d 817, 835 (Tenn. 2002).

In response, McDonald notes that caselaw does not require that Dr. Maceri's education and experience mirror that of Dr. Shea; he need only be sufficiently familiar with the standard of care in Dr. Shea's specialty to provide relevant testimony, citing *Goodman v. Phythyon*, 803 S.W.2d 697, 701-02 (Tenn. Ct. App. 1990).  McDonald insists that Dr. Maceri was qualified to given opinion testimony on Ménière's perfusion treatment and Streptomycin.

In addition to the caselaw cited by the parties, we consider the Tennessee Supreme Court's analysis of this issue in *Shipley v. Williams*, discussed above, decided after oral argument in this appeal.  350 S.W.3d 527 (Tenn. 2011).  In *Shipley*, the plaintiff filed a medical malpractice lawsuit against her general surgeon, alleging negligence in his failure to promptly admit her to the hospital, his failure to properly assess and diagnose her condition, and his failure to provide adequate follow-up care.  *Id.* at 533.  The trial court excluded one of the plaintiff's two experts, a physician who was board-certified in emergency medicine, on the basis that he did not practice in a specialty that was relevant to the standard of care applicable to the defendant surgeon.  *Id.* at 534.

On further appeal, the Supreme court commented that it "would be inclined to agree" with the lower court's disqualification of the emergency medicine specialist "if the issues in this case pertained to surgery."  *Id.* at 556.  It underscored that Section 29-26-115 does not require the claimant's expert witness to practice the same specialty as the defendant medical professional.  *Id.* at 556.  Consequently, *Shipley* emphasized, "courts must look carefully at the particular issues presented in the case to determine if an expert practices a profession or specialty that would make the expert's testimony relevant to those issues."  *Id.*  Because the issues in *Shipley* did not pertain to surgery or related surgical care, but rather to whether the defendant surgeon provided adequate, timely follow-up care, the Court found that the plaintiff's expert was qualified to give testimony that was relevant to those issues.  *Id.* at 557.

In light of *Shipley*, we look at McDonald's specific allegations of negligence by Dr. Shea, as contained in Dr. Maceri's testimony.  First, as to the Ménière's diagnosis, Dr. Maceri's testimony focused on the fact that McDonald's reported symptoms did not include some

which are signature symptoms of Ménière's, including vertigo. His testimony was that, in the absence of distinguishing symptom such as vertigo, a Ménière's diagnosis fell below the standard of care. Next, assuming that Dr. Shea accurately diagnosed McDonald with Ménière's disease,[10] Dr. Maceri testified that the standard of care required that the patient be treated conservatively with a medical regimen focused on changes in diet and treating fluid pressure and stress. Under the standard espoused by Dr. Maceri, treatments such as perfusion would be offered only if the patient's symptoms did not respond to the conservative medical regimen. Because Dr. Shea skipped any medical regimen and immediately upon diagnosis recommended that McDonald receive perfusion treatment, Dr. Maceri opined, his treatment fell below the standard of care. Dr. Maceri also opined that, if perfusion therapy is done, the standard of care requires the use of Gentamycin in the perfusion rather than Streptomycin, because Gentamycin is less ototoxic and less likely to adversely affect the patient's hearing.

We now review Dr. Maceri's experience and qualifications in light of these allegations of medical negligence. Dr. Maceri is board-certified in otolaryngology and practices in otology and neurotology. His practice includes diagnosing and treating numerous patients with Ménière's disease, and has about 40-50 patients with Maniere's at any given time. He also teaches medical students, interns, and resident physicians how to diagnose and treat Ménière's disease. Dr. Maceri treats the patients Ménière's with a medical regimen, such as dietary changes. If the medical regimen does not control the symptoms, which occurs in a small percentage of Ménière's patients, Dr. Maceri advises the patients about the more drastic options available including perfusion therapy. If perfusion therapy is the appropriate treatment for the patient, Dr. Maceri does not do the perfusion, but refers the patient to another physician. Dr. Maceri testified that he is familiar with perfusion therapy and the agents used in perfusion, in order to advise his patients about whether perfusion is appropriate for their condition, the risks, potential side effects, and long term residual effect of the treatment. As part of his knowledge of perfusion treatment, Dr. Maceri has familiarity with both Streptomycin and Gentamycin, and their relative toxicity, although he is not an expert on either agent. Dr. Maceri acquired his knowledge of perfusion treatment and the agents used in perfusion by attending medical education meetings and events, reading medical publications, and through contact with physicians who perform perfusion therapy.

Similar to the situation in *Shipley*, the issues in the case do not appear to involve anything involving Dr. Shea's use of an electrocochleogram in diagnosing Ménière's, but rather, the fact that Dr. Shea diagnosed Ménière's in a patient who was not experiencing vertigo. In Dr. Maceri's practice, he regularly diagnosed patients with Ménière's disease. Moreover, the

---

[10]Dr. Maceri maintained that McDonald did not have Ménière's disease, but was asked to assume that she was correctly diagnosed and then describe how Dr. Shea's treatment fell below the standard of care for treating Ménière's.

issue on perfusion treatment does not appear to involve *how* Dr. Shea performed the perfusion treatment on McDonald, except insofar as he used Streptomycin instead of Gentamycin. Rather, the primary issue is the fact that Dr. Shea performed perfusion therapy at all. Regardless of whether he actually performs perfusion therapy, Dr. Maceri's medical practice regularly requires him to assess the best treatment options for patients with Ménière's disease. This assessment includes consideration of the risks associated with perfusion, including the risks inherent in the agent used, specifically, Gentamycin or Streptomycin. This is sufficient to qualify Dr. Maceri as an expert and to give opinion testimony that "was probative and relevant to the issues and allegations presented in" McDonald's lawsuit. ***Shipley***, 350 S.W.3d at 557.

Under these circumstances, we find no error in the trial court's decision to permit Dr. Maceri to offer expert testimony on McDonald's behalf.

### Excuse of Juror

Finally, Shea argues on appeal that the trial court erred in permitting McDonald's counsel to exercise a peremptory challenge to exclude Juror H from the jury panel after the jury had been sworn and seated. Shea acknowledges that a juror can be challenged for cause after the jury is sworn. ***See Ricketts v. Carter***, 918 S.W.2d 419, 424 (Tenn. 1996). Shea maintains, however, that Juror H was not excused for cause in this case. Shea insists that the parties' right to exercise a peremptory challenge as to any prospective juror ends when the jury is sworn. Because the trial court's alleged error affected the constitutional right to a trial by jury, Shea argues, it should not be deemed harmless error, and this Court should remand the case for a new trial.

In response, McDonald argues that the trial court did not err in allowing her to exercise one of her remaining peremptory challenges upon learning of Juror H's bias, after the jury was sworn but before the parties put on their evidence. McDonald notes the trial court's comments that Juror H's responses to the lawyers' questions indicating that "she would try to do the right thing but . . . she would be in a situation that would be hard for her . . . is sufficient for a challenge." McDonald contends that this ruling "was tantamount to a challenge for cause." Regardless, McDonald argues that the trial court had the authority to permit the exercise of a peremptory challenge as to Juror H under the unique circumstances of this case. Moreover, even if doing so was error on the part of the trial judge, McDonald maintains that the error was harmless, considering the record as a whole, and a new trial is unnecessary and inappropriate.

In Tennessee, the parties in a civil case have the right to have the factual issues in their lawsuit determined by a fair and unbiased jury. Tenn. Const. Art. I, § 6; ***Ricketts***, 918

-24-

S.W.2d at 421. State law provides expressly that the trial court may disqualify a juror if "a state of mind exists on the juror's part that will prevent the juror from acting impartially . . . ." Tenn. Code Ann. § 22-1-105 (2009).

The process of placing the jury in a given case is generally referred to as "jury selection." The term is actually a misnomer, because jurors are in fact not "selected" by the attorneys for the parties. Rather, the members of the venire are designated randomly, and the attorneys in effect "de-select" individual members who would otherwise sit on the impaneled jury. The de-selection of individual prospective jurors[11] is done by a challenge to the prospective juror. *See Estep v. State*, 245 S.W.2d 623, 625 (Tenn. 1951) ("The right to challenge is a right to reject, not to select a jury.") (quoting *Wooten v. State*, 41 S.W. 813 (Tenn. 1897). A jury challenge is a party's request that the trial judge disqualify a juror. *Black's Law Dictionary*, 223 (7th ed. 1999). Challenges to a prospective juror may be either for cause or peremptory. *Crawford v. Heaberg*, 709 S.W.2d 611, 612 (Tenn. Ct. App. 1986). A challenge for cause is a party's challenge to a member of the venire that is "supported by a specified reason . . . that would disqualify that potential juror." *Black's Law Dictionary* 223 (7th ed. 1999).

Challenges of prospective jurors for cause fall into two classes: 1) *propter defectum* (on account of some defect), arising from personal objections as alienage, infancy, lack of statutory requirements, etc., and (2) *propter affectum* (on account of partiality) arising from some bias or partiality either actually shown to exist or presumed to exist from circumstances. *Tenn. Farmers Mut. Ins. Co. v. Greer*, 682 S.W.2d 920, 923-24 (Tenn. Ct. App. 1984)(citing *Durham v. State*, 188 S.W.2d 555 (Tenn. 1945)). *Propter defectum* objections to jurors do not raise the presumption of bias, and so can be made at any time until the jury renders its verdict. *Tenn. Farmers Mut. Ins. Co.*, 682 S.W.2d at 924. In contrast, a *propter affectum* objection to a juror can be made at any time, even after the verdict is rendered. *Id.*; *see also Ricketts*, 918 S.W.2d at 424 ("[A] party has the right to challenge a juror for cause, on the basis of a lack of impartiality, *after the jury has been empaneled or even after the verdict has been rendered.*") (emphasis in original). *See generally*, Robert E. Burch, *Trial Handbook for Tennessee Lawyers* § 6:15 (2011 ed.).

The trial court may, within its discretion, dismiss a juror for cause even if the juror maintains that he or she will be able to set aside the circumstance raising a question as to the juror's impartiality. *Carney v. Coco-Cola Bottling Works of Tullahoma,* 856 S.W.2d 147, 149 (Tenn. Ct. App. 1993) (demonstrating a trial court's discretion in determining whether a juror was in fact impartial); *Turner v. State,* 111 Tenn. 593, 614 (Tenn. 1902) ("If a person is disqualified as a juror, he should not be accepted because he states that, notwithstanding

---

[11]Under certain circumstances, the entire panel of jurors may be challenged, termed a "challenge to the array." *See* 47 Am. Jur. 2d *Jury* § 216 (2006).

his opinion, he will render an impartial verdict. When disqualified he cannot render himself "impartial" by expressing the belief that he can render a fair and impartial verdict according to the law and the proof, notwithstanding [his] opinion."); *see also Rice v. State*, 9 Tenn. 432; 1830 WL 895, at *2 (Tenn. 1830) (reversing a trial court for failing to dismiss a juror, even though the juror said he could discard his formed opinion and render an unbiased verdict).

A peremptory challenge, also called a peremptory strike, is the right given to each party to challenge or de-select a limited number of prospective jurors without assigning a reason for doing so. *Crawford*, 709 S.W.2d at 612. The right to peremptory challenges is provided by statute, not by the Constitution. *See* Tenn. Code Ann. § 22-3-104 (2009); *Estep v. State*, 245 S.W.2d 623, 625 (Tenn. 1951) ("[T]he right to challenge proposed jurors peremptorily . . . is a privilege only granted to the accused as a matter of grace by the legislature.") (quoting *Mahon v. State*, 156 S.W. 458, 461 (Tenn. 1912)). The procedure for peremptory challenges is generally left to the discretion of the trial judge. *See State v. Simon*, 635 S.W.2d 498, 507 (Tenn. 1982); Tenn. R. Civ. P. 47.03 (2011); Tenn. Code Ann. § 22-3-101 (2009).

McDonald argues vigorously that parties should be permitted to exercise unused peremptory strikes on individual jurors after the jury is sworn and the trial is underway, at least under the limited circumstances of this case. In support, McDonald cites *State v. Nelson*, 459 So. 2d 510 (La. 1984), a criminal case in which the trial court permitted the State to exercise an unused peremptory challenge after a juror had been sworn. The appellate court in *Nelson* rejected the defendant's contention that he should be granted a new trial based on the use of the peremptory challenge, using a harmless error analysis. *Id.* at 515-16.

McDonald also cites *State v. Thomas*, 673 S.E.2d 372 (N.C. Ct. App. 2009), a criminal case in which a juror, after the jury was empaneled, engaged in conduct that prompted the trial court to re-open *voir dire* as to the juror in question. *Id.* at 373. The trial court declined to remove the juror for cause, and denied the defendant's request to use an unused peremptory challenge to strike the juror from the panel. *Id.* at 373-74. The defendant appealed and requested a new trial. The appellate court in *Thomas* held that once the trial court re-opens *voir dire* as to a juror, each party has an absolute right to exercise any remaining peremptory challenges. *Id.* at 374. As acknowledged by McDonald, this holding was based on the interpretation of a specific North Carolina statute setting forth the procedures to be followed in jury selection and challenges to jurors. *See State v. Freeman*, 333 S.E.2d 743, 747 (N.C. 1985) (interpreting N.C. Gen. Stat. § 15A-1214(g) (1977)) (cited in *State v. Womble*, 473 S.E.2d 291, 297 (N.C. 1996), on which *State v. Thomas* relies).

We are not persuaded by McDonald's arguments on this issue. In the vast majority of jurisdictions, peremptory challenges do not survive the jury selection process, and there is

no right to challenge a juror peremptorily after the jury has been sworn or impaneled. *See* 50A C.J.S. *Juries* § 445 (2011) (citing cases); 47 Am. Jur. 2d *Jury* § 212 (2006) (citing cases); 3 A.L.R.2d 499 (2011), *Peremptory challenge after acceptance of juror* (citing cases) (orig. pub. in 1949). McDonald cites no Tennessee authority permitting the peremptory strike of a juror after the jury has been sworn or impaneled, and we have found none. Existing Tennessee caselaw implies, consistent with the general rule elsewhere, that peremptory challenges are permitted only prior to the jury being sworn and impaneled. *See Kirkendoll v. State*, 281 S.W.2d 243, 248 (Tenn. 1955) ("[a] peremptory challenge of a juror must be made at any time before the jury is sworn."); *Estep*, 245 S.W.2d at 625 ("[B]efore the jury is completed and sworn, the defendant . . . may have learned facts which would justify a challenge for cause, or a peremptory challenge of a juror already accepted, but not sworn. There is no reason why the trial judge should not allow such a challenge."). As stated by the Michigan Supreme court many years ago: "Some period must be fixed during the impaneling of the jury and the actual commencement of the trial when the right to peremptory challenge must end, and we are [s]atisfied that when the parties announce themselves satisfied, and the panel of jurors sworn to try the cause, the right ends." *Ayers v. Hubbard*, 50 N.W. 111, 112 (Mich. 1891). We hold that a party's unused peremptory challenges do not survive the jury selection process, and may not be exercised once the jury is sworn and impaneled.

In the record before us, it is unclear whether Juror H was excluded based on a peremptory strike or for cause. The trial court's initial remarks were certainly focused on McDonald's exercise of one of her unused peremptory challenges as to Juror H. However, after Shea's counsel rightly objected to the exercise of a peremptory challenge after the commencement of the trial, the trial court responded by explaining his reason for excusing the juror, a reason related to the impartiality of the juror, and saying it was "sufficient for a challenge." As we have stated, a peremptory challenge to a juror may be made without assigning a reason, while there must be a reason for a challenge for cause, and a juror's inability to be impartial is a classic reason for a causal challenge.

McDonald argues that, even if Juror H was excused based on a peremptory strike, and even if it were error to do so, any error would be harmless. McDonald cites Rule 36(b) of the Tennessee Rules of Appellate Procedure, which states: "A final judgment from which relief is available and otherwise appropriate shall not be set aside unless considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b).

Shea argues forcefully that the only remedy for such an error is a new trial, because it affects Shea's constitutional right to trial by jury, citing *Ricketts v. Carter*, 918 S.W.2d 419, 424 (Tenn. 1996). However, Shea does not explain how any error affected the judgment in this

case; after Juror H was excused, the case was still tried before a panel of competent, impartial jurors. We must conclude that any error in excusing Juror H was harmless error under the facts of this case.

## CONCLUSION

In sum, we affirm the trial court's denial of Shea's motion for directed verdict on the informed consent claim. We find no abuse of the trial court's discretion in its decision to permit McDonald to retain for trial an expert from a non-contiguous state. We affirm the trial court's denial of Shea's motion to exclude Dr. Maceri from trial based on similarity of community, testimony referencing a national standard of care, and qualification to offer expert testimony on the issues and allegations in the instance case. Finally, we hold that the exercise of a peremptory challenge after the trial is underway is clear error, but under the facts of this case it is harmless error.

The decision of the trial court is affirmed. Costs on appeal are assessed against Appellants, Paul F. Shea, M.D. and Shea Ear Clinic and their surety, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE